**AIRLINE CONSTRUCTION, INC.,
Plaintiff/Appellant,**

**v.**

**William J. BARR, Joyce A. Barr, Jackson National Bank, and Curtis Mansfield, Defendants/Appellees.**

**TRI–STATE SPRINKLER CORPORATION, Plaintiff/Appellee,**

**v.**

**AIRLINE CONSTRUCTION, INC., William J. Barr, Joyce A. Barr, Jackson National Bank, and Curtis Mansfield, Defendants.**

**J & A MECHANICAL, INC.,
Plaintiff/Appellee,**

**v.**

**AIRLINE CONSTRUCTION, INC., William J. Barr, Joyce A. Barr, Jackson National Bank, and Curtis Mansfield, Defendants.**

**BROCK ELECTRIC COMPANY, INC.,
Plaintiff/Appellee,**

**v.**

**AIRLINE CONSTRUCTION, INC., William J. Barr, Joyce A. Barr, Jackson National Bank, and Curtis Mansfield, Defendants.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

Dec. 11, 1990.

Application for Permission to Appeal
Denied by Supreme Court
Feb. 19, 1991.

**252**

Larry K. Scroggs, Ted M. Hayden, and
Michael R. Parham, Memphis, for appellant
Airline Const.

Sidney W. Spragins, Jackson, for appel-
lees William J. and Joyce A. Barr.

Randi B. Rich, Jackson, for appellee Tri–
State Sprinkler Corp.

Roger A. Page, Jackson, for appellee J &
A Mechanical, Inc.

Gary R. Wilkinson, Memphis, for appel-
lee Brock Elec. Co., Inc.

FARMER, Judge.

This is an appeal from a judgment in
favor of the defendants/appellees, William
J. and Joyce A. Barr (hereinafter "Barr")
against plaintiff/appellant, Airline Con-
struction, Inc. (hereinafter "Airline"), for
breach of a construction contract.

This litigation concerns construction
which occurred on Barr's real estate (Old
English Inn) located in Jackson, Tennessee.
Barr engaged the architectural firm of
Brannon/Cutliff to add an addition to the
Old English Inn. Brannon/Cutliff solicited
bids from four construction companies and
accepted the proposal from Airline. On
August 26, 1986, the parties entered into a
construction contract for this addition to

1. Also named as defendants were the Barrs'
lender and the trustee named in the deed of

the Inn. The construction contract called
for 68 new guest rooms (the "rental unit")
and a commercial building consisting of
1490 square feet.

Airline instituted this suit to recover con-
tract balances allegedly owed from Barr in
the amount of $118,198.[1] By later amend-
ment to the complaint, Airline also sought
to recover additional damages for an in-
crease in the scope of work, extended dura-
tion of time, and amounts they were re-
quired to expend for an umbrella liability
policy.

Barr filed a counterclaim claiming Air-
line breached the parties' construction con-
tract. Separate suits were filed by subcon-
tractors (Tri–State Sprinkler Corporation, J
& A Mechanical, Inc., and Brock Electric
Company) to enforce mechanics' liens to
recover for labor, materials and equipment
which they furnished for the project. Air-
line filed counterclaims against J & A Me-
chanical and Brock Electric for alleged
damages due to delays and deficient and
incomplete work. The subcontractors'
cases were consolidated in this action for
trial.

A final judgment was entered by the
Chancellor on September 22, 1989 in favor
of the Barrs and provides in part as fol-
lows:

IT IS, THEREFORE, HEREBY OR-
DERED, ADJUDGED AND DECREED
AS FOLLOWS:

(a) The Barrs shall have and recover
of Airline and Ohio Casualty the aggre-
gate sum of $309,319.45 determined as
follows:

| | | |
|---|---|---|
| (i) | $ 6,435.36 | to complete work covered by the Contract |
| (ii) | $ 2,626.45 | to correct defective work |
| (iii) | $ 45,056.26 | to correct deficiencies in electrical and heating and air conditioning systems |
| (iv) | $ 27,886.20 | for items which should have been paid by Airline |
| (v) | $210,940.00 | for deficiencies not correctable |
| (vi) | $ 5,409.53 | for expenses |
| (vii) | $ 57,000.00 | penalty |
| (viii) | $ 47,188.55 | subcontractor lien claims |
| Less | ($ 93,222.90) | due to Airline under the Contract |
| Total | $309,319.45 . . . . | |

trust, but no money judgment was sought
against them.

(b) The Barrs shall also have and recover of Airline and Ohio Casualty the sum of $75,000.00 for attorneys' fees.

(c) The Barrs shall also have and recover of Airline only the additional sum of $69,028.40.

*As set forth by the appellant, the issues on appeal are:* [2]

I Whether the trial court erred in awarding the Barrs $210,940.00 for diminution of value of the project.

II Whether the trial court erred in awarding the Barrs lost rental as delay damages.

III Whether the trial court erred in awarding the Barrs liquidated damages.

IV Whether the trial court erred in awarding the Barrs damages for other items for correction, completion or security.

V Whether the trial court erred in awarding the Barrs $75,000.00 for attorney's fees.

VI Whether the trial court erred in refusing to award Airline $77,186.00 in damages for the extended project duration.

VII Whether the trial court erred in refusing to award Airline the cost of the additional insurance coverage required and the cost of installing the underground sprinkler system.

VIII Whether the trial court erred in finding that Item 8 of Exhibit C to the Contract provided for Room 221 to be the standard for all purposes for the new rooms.

IX Whether the trial court erred in unilaterally and without proof reducing items requested by Airline.

X Whether the trial court erred in refusing to award Airline damages regarding the many consultants on the job.

XI Whether the trial court erred in denying Airline damages for additional amounts expended in performing work beyond the scope of its contract.

### The Standard Of Review

■ The Tennessee Rules of Appellate Procedure Rule 13(d) provides that:

Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise.

Airline contends that this "presumption of correctness" as provided for in T.R.A.P. 13(d) should not accompany the Chancellor's findings of fact in this case. At the Chancellor's request the parties in this case submitted proposed findings of fact. The Chancellor adopted verbatim the proposed findings submitted by the defendant as the court's opinion. The Chancellor stated that Barr's findings, "best represent the opinion of the Court."

Airline contends that since the Chancellor only stated that these findings "best represented" his opinion without stating which factual findings *actually* represented the court's opinion, the review of this appellate court should be *de novo* and the customary presumption of correctness as set out hereinabove should be disregarded.

The Tennessee Supreme Court held in *Delevan–Delta Corp. v. Roberts*, that:

the preparation of findings and conclusions is a high judicial function. We are committed to the requirement that the trial court's findings and conclusions be its own. However, we are also aware that the thorough preparation of suggested findings and conclusions by able counsel can be of great assistance to the trial court. In an effort to strike a balance between these two considerations, we hold that although it is improper for the trial court to require counsel to prepare findings it is permissible and indeed

2. The appellant set forth numerous sub-issues pertaining to the topical issues stated hereinabove. We shall address these "sub-issues" as we perceive them. Some sub-issues have been omitted because they are pretermitted by the issues addressed.

**254**

sometimes desirable for the trial court to permit counsel for any party to submit proposed findings and conclusions. Findings prepared by the trial judge which represent his independent labor are preferable, however we do not disapprove of party-prepared findings.

611 S.W.2d 51, 52–53 (Tenn.1981); *Strouth v. State,* 755 S.W.2d 819 (Tenn.Cr.App. 1986).

Although we do not feel the Chancellor's procedure should be encouraged, Airline has failed to show us that these party-prepared findings are not in accordance with the Chancellor's own views. Additionally, if Airline were dissatisfied with these findings, then Airline could have moved the court pursuant to Tennessee Rules of Civil Procedure 52.02 to "amend [its findings] or make additional findings...." The plaintiff made no such motion here. *See Delevan–Delta Corp.,* 611 S.W.2d at 53.

Therefore, we conclude that the adoption of the party-prepared findings is neither reversible error nor justification for disregarding the prescribed "presumption of correctness."

### I.

Whether the trial court erred in awarding the Barrs $210,940.00 for diminution of value of the project.

A. *The trial court should have excluded Barr's opinion as to diminution in value of the property as he failed to provide his opinion in supporting proof pursuant to discovery requests by the plaintiff.*

Pursuant to a set of interrogatories, Airline asked the defendant to "state all facts, and IDENTIFY all DOCUMENTS, that YOU contend support YOUR allegation in the counterclaim that YOU have been damaged in the amount of $1,000,000.00 due to the alleged breaches of CONTRACT on the part of Airline." Additionally, the defendant was asked in a deposition on April 26, 1989, "In the counter claim portion of the pleadings, there is a claim for amount of damages in the amount of $1,000,000. Can you give me

any breakdown as to what is included within that one million dollars?" In response to both of these questions the plaintiff was never given a breakdown or figure relating to the diminution of value of this property. At the trial of this proceeding Barr was allowed to testify as to the value of the construction project if it had been constructed free of defects and the value of this project with the alleged defects.

Since Barr did not make his opinion as to the diminution value available to counsel prior to trial, Airline argues that it was error to allow Barr to testify as to this subject matter. Airline contends that the defendants knowingly concealed this information and, therefore, it was a violation of T.R.C.P. 26.05(2)(B) which provides:

A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which ... (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

The basis of the objection to Barr's testimony, as stated by counsel, was because he had not qualified as an expert. Rule 46 T.R.C.P. in effect at the time of this trial provided that the grounds for an objection need be stated only upon request of the court. The rule was amended effective August 1, 1989 to require the grounds to be stated. However, once the objection was made and counsel, absent a request by the court, gratuitously stated the grounds, we believe Airline is precluded on appeal from relying upon other grounds which were not presented to the trial court.

B. *The trial court should have excluded Barr's opinion concerning diminution in value of the property due to the fact that Barr was not qualified as an expert on appraising real estate property values.*

It is well established law in Tennessee that an owner of property may testify as to value of that property. As stated in *State ex rel. Smith v. Livingston Lime-*

*stone Co., Inc.,* 547 S.W.2d 942, 943 (Tenn. 1977):

> In most states, and in Tennessee, the owner of real property is held to be qualified, by reason of his ownership alone, to give an opinion in evidence of the value of his land. *Nashville Interurban Railway Co. v. Seay,* 1 Tenn.Civ.App. 134, 144; *Union Joint Stock Land Bank of Louisville v. Knox County,* 20 Tenn. App. 273, 97 S.W.2d 842 (1936); 32 C.J.S. Evidence § 546(120), at 470; 5 Nichols, Law of Eminent Domain, at 18–117. Because of his interest in the land as its owner, it is presumed that he knows the value of it; hence, he qualifies as a witness by showing mere ownership. 1 Wigmore on Evidence, § 716; 31 Am. Jur.2d 137.

The plaintiff contends, however, that the aforesaid rule is not applicable in this case and Barr should not have been allowed to testify. According to the plaintiff's contentions, Barr should not have been allowed to testify as to the value of his property because he was not qualified as an expert to testify as to commercial property values or as to what effect the defects had on the hotels income-producing capabilities. The plaintiff contends that this case is one that requires the aid of a knowledgeable and experienced expert and such testimony and/or information cannot be obtained from a lay witness. *See Lawrence County Bank v. Riddle,* 621 S.W.2d 735, 737 (Tenn. 1981); *Kinley v. Tennessee State Mutual Ins. Co., Inc.,* 620 S.W.2d 79 (Tenn.1981).

We do not feel that an exception or departure from the long-established rule would be necessary in this case. The trial court should merely look at the factors involved and afford that testimony the appropriate weight.

As the trial court stated in response to the plaintiff's objection:

> Well, if an owner testifies to the value of property, be it personal or real, you have to look at the weight of that. I mean, you've seen testimony where it was outrageous what they testify to, but it was still admissible. Mr. Barr has not been qualified as an expert, but he has been—

> there's been testimony he's been in business for twelve to fourteen years, that he's drawn plans out there on the other unit, that he, no doubt about it, was on the job on this about ninety-eight, ninety-eight percent of the time.

> I'm going to let him testify. It's his property and his note. I'm going to let him testify and we'll just give it what weight it is.

C. *The trial court should not have given any weight to Barr's testimony on diminution in value as it has no rational basis.*

 The defendant testified that he was entitled to diminution of value damages equal to $210,940. The proof that Barr set forth to establish these damages was his own testimony. Barr testified to the diminution in value of his property as follows:

Q. Do you have an opinion of what the value of the project would have been if it had been constructed free of any defects. In other words—

A. As far as Airline Construction goes?

Q. Yes.

A. Okay. Yes, I do.

Q. What is that opinion?

A. $2,109,404.10.

Q. Where did you get that figure?

A. From the contract.

Q. That's what the contract called for?

A. Right.

Q. Do you think it would have been worth that if it had been built without any defects?

A. Yes.

Q. Now, I'll ask you as the owner, do you have opinion as to what the value of the project would have been at the time of completion with the defects that haven't been or can't be corrected, because to do so would require unreasonable destruction of the work by Airline and would cost—and the cost would be grossly disproportionate to the results obtained?

A. Yes, I do.

Q. And what is that?

A. $1,898,460—360.

Q. What is the difference in those two figures?

A. Ten percent.

Q. And now, if you will, tell us why you feel that the ten percent is appropriate?

A. Without going into great detail, because of the aesthetics of the building itself.

Q. For example?

A. Some day when the property is sold—if it's sold,—owners—prospective owners look at everything, including the prospects of maintenance on a building. I know that to be fact because I've had people that have looked at it. They want to know that the maintenance is. They go through the whole building and which has been done already, and they point out some deficiencies they don't like—

The defendant also testified about numerous defects in the construction work, however, he never stated an estimated price or even what he thought it would cost to cure these defects. Additionally, the defendant never stated how he arrived at this arbitrary ten percent reduction figure or the correlation between the defects and this numerical ten percent figure.

The trial court stated in its findings of fact and conclusions of law:

> Considering all of such factors, Barr, as the owner, testified and the Court finds that the value of the Project, if it had been constructed according to the Plans and Specifications, would have been the amount of the Contract or $2,109,404.00. Barr further testified, based upon his knowledge of hotel facilities, that the value of the Project as built by Airline and with the defects such as noted is actually $1,898,360.00 or 10% less than the Contract amount, a difference of $210,940.00.

Barr testified that he was personally involved and actively participated in the building and development of this facility. He was physically present during construction 98 percent of the time. Barr contends that these factors give him a reasonable basis upon which to rest his "10% opinion."

To support an award of damages there must exist proof of these "damages within a reasonable degree of certainty." *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn.Ct.App.1985), citing *Wilson v. Farmers Chemical Ass'n.*, 60 Tenn.App. 102, 111, 444 S.W.2d 185, 189 (1969), and *Acuff v. Vinsant*, 59 Tenn.App. 727, 737, 443 S.W.2d 669, 674 (1969). Based upon the proof in this record we conclude that there was no reasonable or rational basis upon which the trial court could have awarded diminution in value damages.

The owner, who was the sole proof of damages in this case, did not attempt to provide a rational basis for his ten percent valuation method. Barr did not point to any significant factors which gave rise to this ten percent reduction other than "aesthetic reasons."

■ Although an "owner" of real property is deemed to have special knowledge about his property to offer an opinion as to its value, the owner's opinion will be given little weight when founded upon pure speculation. There must be some evidence, apart from mere ownership, that this "value" is a product of reasoned analysis. This reasoning is consistent with the United States Claims Court as set forth in *Snow Bank Enterprises, Inc. v. United States*, in which it stated an owner's opinion as to the value of his property "must be founded upon evidence in the record, rather than upon conjecture, speculation or unwarranted assumptions." 6 Cl.Ct. 476 (1984), citing *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir.1966).

The trial court should have given no weight to Barr's valuation testimony. Without Barr's testimony, there is no proof of diminution in value damages, therefore, we conclude there can be no award of such damages in this case. *Inman v. Union Planters National Bank*, 634 S.W.2d 270 (Tenn.Ct.App.1982).

## II.

Whether the trial court erred in awarding the Barrs lost rental as delay damages.

A. *The trial court should have excluded the testimony of Lawson Crain as Crain was never identified as an expert*

*witness in Barr's response to plaintiff's interrogatories.*

■ Lawson Crain, a certified public accountant who provides accounting services to Barrs' Old English Inn, testified that the net income per day/per room was $31.15. Airline contends that, pursuant to a set of interrogatories, they requested that the defendant "IDENTIFY each and every PERSON that YOU intend to call at trial as an expert witness and each and every report prepared by the expert witness for YOU and for each PERSON identified, please state the subject matter on which the expert is expected to testify, state the substance of the facts and opinions to which the expert is expected to testify, and give a summary of the grounds for each opinion." The defendant never identified Lawson Crain as an expert in response to these interrogatories, nor did he submit a breakdown of the rental value that Mr. Crain had prepared.

Airline contends that since Mr. Crain's name was never identified as an "expert", then the plaintiff is in violation of T.R.C.P. 26.05(1) which provides:

A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) *the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.* (Emphasis added)

Lawson Crain was, however, identified as a witness in this case in response to interrogatory no. 3 filed on December 7, 1987. This interrogatory requested that the defendant "IDENTIFY each and every *witness* YOU intend to call at trial." (Emphasis added) The defendant named Lawson Crain as a witness in response to this interrogatory. Although plaintiff contends

that Crain should have also been named as an expert, we simply cannot agree.

In *Alessio v. Crook,* the court held that "[a]n expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer in regard to the occurrence should be treated as an ordinary witness and not as an expert as contemplated by Rule 26, TRCP." 633 S.W.2d 770, 779 (Tenn.Ct.App.1982).

Mr. Crain, as we have noted, was working and providing accounting services to the Barrs prior to this litigation. Mr. Crain testified that:

Q. Do you do and provide the accounting service for the Sheraton Old English Inn?

A. Yes, I do.

Q. What service do you provide for the Old English Inn?

A. We actually provide the monthly accounting services. We take the—we don't write the checks, we don't deposit the monies, but basically from there we receive information, check stubs and so forth, and we key those into the computer and provide monthly financial statements for them and do year end as well.

Q. Is that service—in providing that service, are you familiar with the expenses that Old English Inn incurs in operating the Inn portion—

A. Yes.

Q. —the Sheraton portion of Mr. Barr's operation?

A. Yes.

Q. At my request and Mr. Barr's request, did you undertake to calculate the net income per day per room for the new addition built by Airline in this case?

A. Yes, I did.

Q. In doing that, what categories of expense did you consider to be appropriate?

A. I considered, of course, the interest, depreciation, the insurance, taxes, wages, utilities and then the miscellaneous, other items.

Q. Based upon your familiarity with the books and records of the company, did

you calculate a figure on a per room basis for each of those categories?

A. Yes.

As Mr. Crain testified, he calculated this per day/per room net income based on his "familiarity with the books." Mr. Crain merely derived this figure from facts he regularly viewed or derived in the regular course of his business for Old English Inn.

Additionally, it is hard for us to conceptualize Mr. Crain being viewed as an expert when he is regularly employed by the defendant for the purpose of his expertise for which he testified at trial. As stated in *Virginia Electric & Power Company v. Sun Shipbuilding & Dry Dock Co.,* 68 F.R.D. 397, 406–410 (E.D.Va.1975) "a person who is an expert in a trade or science but who is neither retained nor specially employed but merely is, has been, and will be an employee of defendant without regard to the pendency of the claim," should not be regarded as an expert for purposes of discovery.

Since we have concluded that Mr. Crain was not an expert for purposes of this trial, the defendant was under no obligation to supplement the interrogatories pursuant to T.R.C.P. 26.05(1)(B). In light of the foregoing determination, we see no need to address the defendant's contention that the plaintiff failed to raise a timely objection to this issue.

B. *The trial court should not have awarded the Barrs loss profits as they were based on an alleged oral promise that should have been excluded by the parol evidence rule.*

■ In defendants' counterclaim, Barr claimed:

16. As an inducement to William J. Barr to enter into the Agreement, the plaintiff orally agreed to complete the guest room portion of the Project within six (6) months after the commencement of the work, which plaintiff failed to do as a result of neglect, oversight, and dilatory pursuit of work resulting in damages by reason of loss of rental revenue as will be made to more fully appear at the trial of this cause.

This counterclaim is based on an alleged oral agreement between the parties whereby, the plaintiff allegedly promised to complete the "rental unit portion" of the construction project in six months. This oral agreement was allegedly entered into prior to the signing of the contract.

Jerry Moore was the project manager on the Old English Inn construction project for Airline Construction. Mr. Moore testified that he did, in fact, tell the defendant that he felt like it would take about six months to complete the rental units. The contract that the parties entered into, however, provides:

### ARTICLE 2

### THE WORK

The Contractor shall perform all the Work required by the Contract Documents for

1. An addition to the Old English Inn, Jackson, TN. The combined facility will become a Sheraton Hotel Franchise. All work will be in compliance with and conform to the Construction standards of Sheraton Inns, Inc.

2. *Construction of 68 new guest rooms* (2 story inside corridor).

3. Construction of a new commercial building consisting of an approximately 14,900 gross square feet.

4. Construction of al site work as shown in Contract Documents.

### ARTICLE 3

### TIME OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

The Work to be performed under this Contract shall be commenced upon written notice to proceed by the Architect and, subject to authorized adjustments, *Substantial Completion shall be achieved not later than 240 calendar days* after issuance of Building Permit. A payment of One Thousand Dollars ($1000.00) per day for every day later than the above specified timeframe shall be paid by Contractor to Owner.

A payment of Five Hundred Dollars ($500.00) per day shall be paid to the Contractor by the Owner for completion of the work prior to the above specified time-frame. (Emphasis added)

█ Under the parol evidence rule parol evidence is inadmissible to contradict, vary, or alter a written contract where the written instrument is valid, complete, and unambiguous, absent fraud or mistake or any claim or allegation thereof. 32A C.J.S., *Evidence,* § 851 at 213 (1974); *See Littlejohn v. Fowler,* 45 Tenn. (Caldwell) 284 (1867); *Marron v. Scarbrough,* 44 Tenn. App. 414, 314 S.W.2d 165 (1958). This well established rule at common law is also embodied in T.C.A. § 47–2–202:

**Final written expression—Parol or extrinsic evidence.**—Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein *may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement* but may be explained or supplemented:

(a) by course of dealing or usage of trade (§ 47–1–205) or by course of performance (§ 47–2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement. (Emphasis added)

Barr contends that the parol evidence rule does not exclude this oral six-month agreement because such agreement was an "inducement" or an "independent collateral agreement" to the parties' construction contract.

█ Parol proof of "inducing representations" or "collateral agreements" to the written contract must be limited to subject matter which does not *contradict* or *vary terms* which are plainly expressed in the writing. *Searcy v. Brandon,* 167 Tenn. 218, 68 S.W.2d 112 (1934); *Litterer v. Wright,* 151 Tenn. 210, 268 S.W. 624 (1925); *Dupont Rayon Company v. Roberson,* 12

Tenn.App. 261 (1930); *Seaton v. Dye,* 37 Tenn.App. 323, 263 S.W.2d 544 (1954). In light of the foregoing, we are presented with the question of whether the alleged oral agreement contradicts or varies the terms of the written contract.

The contract clearly stated that the construction was to be completed in "240 calendar days" and the contract also listed as one of the items of work to be completed the "construction of 68 new guest rooms" (the controverted rental unit portion of the contract). For us to say that the rental unit portion was to be completed in six months as the defendant contends, would not only vary the 240 day provision, but it would directly contradict it.

Additionally, after the parties' initial meeting where they discussed this "six month period," the parties agreed to add an additional 14 items to the list that was included in the base bid price which Airline had submitted to the defendant. These additional items were added to or incorporated in the original contract prior to it being signed and the base bid price was accordingly increased. It seems apparent that if the parties had intended for this six month period to be part of the contract, then it too would have been added to the construction contract.

Since the parol evidence in this case contradicts and varies the parties' writing and this testimony is thereby inadmissible, then all damages awarded as a result of such are also denied.

### III.

Whether the trial court erred in awarding the Barrs liquidated damages.

A. *The trial court should not have awarded the Barrs liquidated damages as they were also awarded actual damages.*

█ The contract contains a liquidated damages provision which provides for $1,000 a day delay damages. These damages are to be assessed for each day Airline has not achieved substantial completion beyond the 240–day completion date. Airline contends that the "liquidated dam-

age provision" should be held invalid because liquidated damages are only proper when the damages in a case are uncertain or difficult to prove. Additionally, the plaintiff argues that these damages are merely a fine and equivalent to a penalty. Airline contends that since the Barrs were also awarded actual delay damages pursuant to the alleged "oral agreement," then this award of liquidated damages would essentially amount to a double recovery and would, therefore, be equivalent to a fine.

 Liquidated damages are a sum that the parties to a contract agree should be paid in the event of a breach in order to compensate the injured party. *V.L. Nicholson Company v. Transcon Inv. and Financial Ltd., Inc.*, 595 S.W.2d 474, 484 (Tenn.1980); 9 Tennessee Jurisprudence, *Damages*, § 29 (1983). Liquidated damages create certainty where damages are difficult to ascertain. The stipulated amount or sum should be "reasonable in relation to the terms of the contract and the certainty with which damages can be measured; there must exist a reasonable relationship between the amount and what might reasonably be expected in the event of a breach." *V.L. Nicholson Company*, 595 S.W.2d at 484.

 Insofar as Airline's allegation that this award of damages is a penalty because Barr was also awarded lost profits under the "oral agreement," this issue is now moot because we have concluded that the admission of this evidence violates the parol evidence rule.

With regard to Airline's contention that the damages in this case are readily ascertainable and can be proven with certainty, we find little merit in this argument. The only damages that Airline points out that Barr readily proved in this case was the per room/per day net income of the rental unit portion of this project. The rental units, however, were only one part to the parties' contract.

Provisions are frequently provided for in construction or building contracts to provide for liquidated damages in the event of a delay. The uncertainty of damages is typical in these types of claims. *See City of Bristol v. Bostwick*, 146 Tenn. 205, 240 S.W. 774 (1922); *Illinois Central Railroad Co. v. Southern Seating and Cabinet Co.*, 104 Tenn. 568, 58 S.W. 303 (1900); 25 C.J.S., *Damages*, § 106 (1974). It would be very difficult in this case to ascertain the amount of damages that was caused by Airline's delay; Airline has not convinced us to the contrary. Additionally, the plaintiff has not pointed to anything in the record that indicates that $1,000 a day is unreasonable under the circumstances. Accordingly, we conclude that this liquidated damage provision was proper and reasonable under the circumstances.

B. *The trial court should not have awarded the Barrs liquidated damages for owner-caused delays.*

 The trial court in the instant case awarded the defendant $57,000 in liquidated damages based on its conclusion that Airline delayed 57 days beyond the substantial completion date required in the parties' contract.

Airline contends that Barr made numerous changes to the original plans which resulted in lengthy delays in the execution of the project. Airline compiled a list of 68 changes that Barr made to the project. Allegedly there were two changes to the structure itself, seven changes to the skin, and 42 changes to the finished work.

Airline introduced the testimony of David Pearson, a scheduling expert, who opined that a 61-day time extension should have been issued due to the changes initiated by Barr. Airline had requested extensions of time due to these changes but they were never forthcoming.

The trial court disallowed any days due to Barr's changes. The Chancellor concluded that Mr. Pearson's testimony should be afforded little weight because it was nothing more than an "educated guess." Although the court acknowledged that Barr made changes and additions, it concluded that there was "no specific evidence that any of those changes or additions resulted in significant delays or time loss to Airline."

As we have noted, the trial court's findings of fact are accompanied by a "presumption of correctness" unless the evidence in the case preponderates otherwise. T.R.A.P. 13(d). We must conclude, however, that the evidence in this case is abundantly otherwise.

Airline introduced several letters that subcontractors had written during the progression of the project that indicate that Airline's allegations are indeed correct. Robert Brock of Brock Electric stated in a letter dated March 17, 1987, that:

> [T]he owner has made so many changes that there are actually no drawings that correspond with the actual work that is being done. Considering this situation, the only way the job can proceed is by all the trades asking a lot of questions and/or being given a lot of verbal information. This is time consuming and leads to the possibility of mistakes and conflicts.

Jim Tuttle of Tri–State Sprinklers stated in a letter dated July 28, 1987,

> I wish to express that I have never seen a project with so many changes as this one.... 
> [A] decent set of plans, pre-construction changes made and a settled mind will usually produce a finished product within a reasonable time. However with the changes made on this project that affected every contractor on this job, I am surprised that this job is where it is now rather than in litigation.

Not only did the subcontractors on this project corroborate Airline's allegations through letters and testimony, but Barr's architect, Brannon, stated that he felt a 30– to 40–day time extension was appropriate due, in part, to Barr's changes. Brannon testified as follows:

> Q. Did you arrive at a judgment in your own opinion, based upon your experience, as to the number of days of time extensions that should have been granted the contractor for changes in the scope of the work?
> A. Well, I had kind of in my own mind lumped that together with some weather days. And again, I am almost certain I

through [sic] this out during our big meeting and then, the negotiations broke down. For all of those, it was somewhere between thirty and forty days.
> . . . .
> A. Okay. Airline Construction asked for time extensions. Mr. Barr and I always said at a point later on in the project we would come to an agreement. We never agreed to certain days during the course of the project.
> Q. And I think that you said that you never agreed with Airline as to whether they should have a number of days on account of weather, or a number of days on account of changes in the scope of the work?
> A. Well, again, in the general industry, it's customary to have changes in time all the time, that's a standard thing you do. And when you increase the scope of a project, you would typically increase the time. When you decrease something, you decrease the time. And if you had terrible weather at times, you would increase it because of that. So, it's customary.

Not only did Barr's numerous changes contribute to the delay on this project, but Airline contends that Barr's active interference in the project was also a contributing factor. Barr was admittedly on the project 98 percent of the time. Jerry Moore, Airline's project manager, testified that he could not control the job because Barr was continuously on the site making changes. Mr. Moore testified that Barr went so far as to "climb up on the scaffold and took hammers out of our carpenter's hand and was showing him how to drive the nails, pulling the boards down and putting them in different locations and trying out different looks to see what it would look like." Mr. Moore stated that this was merely one example of an endless list of interferences that attributed to the slow progression of the project.

While we are aware that the trial court may have put little weight on the credibility of some of these witnesses, when you look at the testimony of the architect, the subcontractors and their letters, Jerry

Moore, and the expert testimony of David Pearson, it is abundantly clear that Barr at the very least contributed to some of the delays on this project.

As the defendant stated in his brief:

The essence of the Trial Court's findings on these issues was that any delays which Barr may have caused in the completion of the Project either by additions or his personal presence or "interference" on the job were outweighed by the delays attributable to Airline or its subcontractors or suppliers as well as deletions of time consuming portions of the Project originally contracted for.

Although Barr and the trial court have both pointed to numerous delays that were attributable to Airline, we cannot hold the plaintiff liable for all the delays merely because Airline's delays may have outweighed those occasioned by Barr. The law in Tennessee is contrary to this conclusion. Liquidated damages will not be awarded to one *that has contributed to or mutually caused the delay* or breach. *V.L. Nicholson Company v. Transcon Investment and Financial Ltd., Inc.,* 595 S.W.2d at 484, citing *Glassman Const. Co., Inc. v. Maryland City Plaza, Inc.,* 371 F.Supp. 1154 (D.C.Md.1974), *aff'd,* 530 F.2d 968 (4th Cir.1975); 9 Tennessee Jurisprudence, *Damages,* § 29 (1983).

The defendant in this case could have recovered "actual" delay damages, *See* Mayo, Tennessee Law of Damages, § 15–5 (1988). However, absent proof of such damages there can be no award. Additionally, we are aware that the parties' contract provided a means whereby these delays could have been apportioned among the parties. Section 8.3.1 of the General Conditions of the parties' contract provides as follows:

**8.3 DELAYS AND EXTENSIONS OF TIME**

**8.3.1** If the Contractor is delayed at any time in the progress of the Work by any act or neglect of the Owner or the Architect, or by any employee of either, or by any separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual

delay in transportation, adverse weather conditions not reasonably anticipatable, unavoidable casualties, or any causes beyond the Contractor's control, or by delay authorized by the Owner pending arbitration, or by any other cause which the Architect determines may justify the delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

Barr could have granted time extensions to accommodate Airline for the numerous changes he made. Nevertheless, since he did not, we do not have sufficient proof to ascertain which delays he caused and those which Airline occasioned.

For all the foregoing reasons we find that the award of liquidated damages in this case was error.

### IV.

Whether the trial court erred in awarding the Barrs damages for other items for correction, completion or security.

A. *The trial court should not have awarded the Barrs damages for mechanical corrections.*

1. *Proof regarding HVAC damages should have been excluded since not produced during discovery.*

The trial court awarded Barr damages for heating and air conditioning deficiencies. This award of damages was based on a report prepared by and/or the testimony of William Lawrence. J & A Mechanical, Inc. (subcontractor) and Airline both contend that no damages should have been awarded for these deficiencies because the proof offered by Barr to support these deficiencies should have been excluded.

Despite discovery requests propounded prior to trial seeking this type of information, Barr did not reveal the identity of Mr. Lawrence until two days prior to trial. An estimated list of repairs prepared by Lawrence, which was admitted into evidence, was only first supplied to counsel five days after the trial began. J & A Mechanical objected to allowing Mr. Lawrence's testi-

mony with regard to the list both when the list was first supplied to them and again when Mr. Lawrence testified.

J & A and Airline both contend that they were disadvantaged and harmed with regard to this damage testimony. They argue that they did not hire an expert to refute any of these claims that Airline made for these damages because it appeared from the discovery request that there would be little to refute.

■ The purpose of pre-trial discovery is to eliminate the "surprise" element and enable the parties to discern what is at issue prior to trial. *Wright v. United Services Auto. Ass'n.,* 789 S.W.2d 911, 915 (Tenn.Ct.App.1990), citing *Ingram v. Phillips,* 684 S.W.2d 954, 958 (Tenn.Ct.App. 1984) and *Strickland v. Strickland,* 618 S.W.2d 496, 501 (Tenn.Ct.App.1981). When a party fails to reveal the name of an expert in response to pre-trial discovery, the court is given broad discretion or authority to punish these abuses and to impose sanctions. *Wright,* 789 S.W.2d at 915; *Strickland,* 618 S.W.2d at 500–01; T.R. C.P. 37.

■ *Strickland* states that, dependent on the factors present in each case, the trial court may simply "permit the witness to testify, or it may exclude the testimony, or it may grant a continuance so that the other side may take the deposition of the witness or otherwise prepare to meet the testimony." 618 S.W.2d at 501. However, when such omission is willful, knowing or deliberate an exclusion of the witness's testimony *is suggested. Id.; Lyle v. Exxon Corp.,* 746 S.W.2d 694, 699 (Tenn.1988).

The record in this case does not reflect that Barr deliberately or willfully concealed the identity of Mr. Lawrence or his report. Barr's counsel stated that he did not supply the information any sooner because he simply did not have it.

Although there is some discrepancy as to whether Barr actually had the report prior to the fourth day of trial, we still are not convinced that the trial court abused its discretion. The record reflects that J & A's counsel did in fact interview Mr. Law-

rence prior to his testimony and we assume Airline had the same opportunity. J & A, in fact, produced an expert at trial who refuted Mr. Lawrence's testimony.

We simply see no evidence in the record that indicates that the trial court abused its discretion in this case. In light of this determination, it is not necessary to decide whether Airline properly objected to the introduction of this evidence or whether Mr. Lawrence should be excluded from the definition of an "expert."

2. *The weight of the evidence is that these damages were too much or not necessary.*

■ Mr. Lawrence's estimate of $41,-357.24 to correct some of the alleged deficiencies was based on a list of items prepared by Wayne Hardeson. Hardeson had prepared a report that listed the defective items in the project. Mr. Lawrence took the list prepared by Hardeson and priced the alleged deficiencies.

Wayne McMorris, president of Airline, testified that Mr. Hardeson's list or report was based on erroneous information. The plaintiff argues that the Hardeson report was prepared relying on the original set of plans instead of the alleged modified plans which Airline followed.

Airline argues that the testimony of Cecil Sellers, the engineer of record, gives credibility to McMorris' testimony that Hardeson (NJC, Inc.) had the wrong set of plans. Mr. Sellers testified that he had approved some of the items on Hardeson's list and further testified that other items satisfied the Standard Mechanical Codes.

■ Airline also argues that the award of damages here is contrary to the proof at trial. Airline contends that the estimate of John Reeves', plaintiff's expert, should have been adopted rather than Mr. Lawrence's since Reeves' estimate was $30,-510.96 less than Lawrence's. Airline tries to persuade this Court that this issue is not one of witness credibility, but instead merely one of the court accepting the lowest priced estimate of repair.

The plaintiff has cited no authority for this proposition and, in fact, the law in

Tennessee is to the contrary. The trial judge is not under an obligation to accept as conclusive the lowest estimate from whatever expert may testify. As the Tennessee Supreme Court stated in *Gibson v. Ferguson*, 562 S.W.2d 188, 190 (Tenn.1976):

> Expert opinions, at least when dealing with highly complicated and scientific matters, are not ordinarily conclusive in the sense that they must be accepted as true on the subject of their testimony, but are purely advisory in character and the trier of facts may place whatever weight it chooses upon such testimony and may reject it, if it finds that it is inconsistent with the facts in the case or otherwise unreasonable. Even in those instances in which no opposing expert evidence is offered, the trier of facts is still bound to decide the issue upon its own fair judgment, assisted by the expert testimony. *Act–O–Lane Gas Service Co. v. Hall*, 35 Tenn.App. 500, 248 S.W.2d 398 (1951).

We feel the issue here is largely dependent on witness credibility. When the trial court has made a decision which hinges on witness credibility, then it "will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear, concrete and convincing evidence to the contrary." *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn.Ct.App.1974); *Browder v. Hite*, 602 S.W.2d 489 (Tenn.Cr.App.1980).

With the foregoing in mind, and the fact that Airline is unable to point to any specific deviations in the plans, we are unable to conclude that the evidence preponderates contrary to the trial court's determination.

3. *If these items constituted a breach of Airline's contract, then they constituted a breach of J & A's contract and should be passed through.*

 This issue was not raised in the trial court and, therefore, cannot be raised for the first time on appeal. *Sparks v. Metro Gov. of Nashville and Davidson County*, 771 S.W.2d 430 (Tenn.Ct.App. 1989); *Smith v. Harford Mut. Ins. Co.*, 751 S.W.2d 140 (Tenn.Ct.App.1987); *B & B Distributing Co., Inc. v. Metro Nashville*, 667 S.W.2d 751 (Tenn.Ct.App.1983).

B. *The trial court should not have awarded the Barrs damages for electrical corrections.*

 Barr engaged Dewey Gray of NJC, Inc. to search the construction project for electrical deficiencies. One of the electrical deficiencies mentioned by Mr. Gray was the "plug-in" type breakers which were used in place of the "bolt-on" breakers as specified in the plans. Gray included an estimate in his report which stated that the proper breakers could be installed for $2,086.96. The Chancellor awarded the Barrs this amount based on Mr. Gray's report.

Steve Jenovetz, who was at one time an employee of Airline's subcontractor Brock Electric, testified that he had a conversation with Barr in which Barr stated that he wanted to add some coffee makers and hair dryers in rooms in the hotel. Barr didn't want to spend any more money on the project, so Mr. Jenovetz suggested switching to a lower quality panel board and from copper to aluminum wire. By switching to the lower quality panels it was the intention that this cost saving would "wash" with the cost of the coffee makers and hair dryers.

Mr. Jenovetz wrote a letter to Jerry Moore, an Airline employee, in which he stated, "In an effort to keep the price down after several electrical changes, we are changing from panelboard construction to load center construction on all panels, wherever possible. We are doing this after discussing the situation with the owner."

Mr. Jenovetz stated on cross-examination that the architect on this project did not ask him to make these changes. When he was questioned as to who asked him to make these changes he answered, "I made them in order to keep the price down for Mr. Barr." Additionally, although Mr. Jenovetz made a recommendation to Barr to go ahead with the lower quality panel, he stated on cross-examination that he did not inform Barr of any of the risks associated with this change.

The specifications for this project were specific about using bolt-on breakers. Mr. Gray stated that bolt-on breakers minimized maintenance in the long run. The "bolt-ons" stay firmly into the panel, while the "plug-ins" loosen up in time.

Airline argues that the trial court penalized them for a mistake that they knew nothing about and played no part therein. Airline alleges that Jenovetz was in fact Barr's agent and not theirs.

Airline's contention we feel is without merit. Although Mr. Jenovetz was originally working for Electrical Spectrum, who may very well be classified as a representative of the electrical engineer of record, when he made the changes mentioned hereinabove he was working for Brock Electric, a subcontractor of Airline. Furthermore, it is quite apparent that Airline knew of these changes because they received a letter from Mr. Jenovetz setting forth these changes. Mr. McMorris of Airline even wrote a letter to Barr indicating that they would be willing to give Barr a credit or replace the breakers, whichever Barr wished. .

It is evident from the testimony set forth hereinabove that the trial court properly concluded that Brock made these changes without authorization to do so, and Airline, being the one who contracted Brock, is thereby responsible. Brock's representative here had no authority to authorize any deviations from the plans. There is no indication that any change orders were issued for this deviation. Furthermore, we are convinced that neither the architect nor the owner authorized these changes. Therefore, Airline, through their subcontractor, proceeded at their own peril and assumed the risk of these deviations. *Missouri Portland Cement Co. v. J.A. Jones Const. Co.*, 323 F.Supp. 242 (M.D.Tenn. 1970), *aff'd.*, 438 F.2d 3 (6th Cir.1971).

■ The trial court also awarded the Barrs $1,612.41 for other alleged deficiencies listed in Gray's report. Airline contends that this report was flawed for the same reasons they alleged Hardeson's was erroneous. Even if Gray did have the wrong set of plans, and we are not con-

vinced he did, Airline has not provided any proof that these items complained of were different than those in the revised plans. The only testimony that Airline has pointed to that even stated an item that may have possibly differentiated between the revised plans and the report was one item that Mr. Brock, of Brock Electric, pointed out. However, it was apparent from his testimony that he really wasn't sure if anything was different or not. Mr. Brock testified as follows:

Q. Is there anything mentioned in that report that—is based upon something that's not in the plans and specifications as you know them to be?

A. I don't know. That's get's [sic] into whole—I think that we would probably like to reply to each and every one of them. I don't know if we're prepared to at this point or not. . . .

A. I can recall one thing. For instance, that from one particular panel to another particular panel—the report said that we had one set of five hundred thousand copper conductor. And the plans called for two runs of two hundred and fifty MCM, which combined, would be larger.

We are unable to conclude that the trial judge erred in relying on Gray's report.

Lastly, with regard to Airline's contention that these damages should "flow down" to Brock Electric, this issue was not raised in the trial court and we will not address it here.

C. *The trial court should not have awarded damages based on the NJC reports as Airline was not contractually required to perform them.*

■ Airline alleges that the reports of Hardeson and Gray should be discounted because when the architect prepared his final punch list he stated:

Q. Mechanical, Plumbing and Electrical Subsystems

The Owner has retained independent engineering consultants to inspect and evaluate the performance of the M,P & E sub-contractors and the installation of their respective systems. We have reviewed these reports by Hickey/Johnson,

Inc. dated 10/14/87 (electrical) and Barham Shappley, Inc. dated 9/28/87 (mechanical & plumbing) and have found them to be quite thorough.

Airline argues that, pursuant to 2.2.7 in the General Conditions section of the parties' contract, they are only contractually required to perform the Hickey Johnson and Barham–Shappley reports. Section 2.2.7 provides:

**2.2.7** The Architect will be the interpreter of the requirements of the Contract Documents and the judge of the performance thereunder by both the Owner and Contractor.

We reject Airline's argument. Barr introduced the Hardeson and Gray report to show the deficiencies in the project and to set forth the damages that were attributable to Airline. Section 2.2.7 of the contract does not bind the trial judge to ignore the deficiencies and/or defects in the project.

D. *The trial court should not have awarded the Barrs damages for:*

### Payments to Consultants

■ The Chancellor awarded the Barrs $5,409.53 for payments to consulting engineers retained to inspect and/or ascertain the deficiencies in the project. Section 7.7.1 of the General Conditions of the parties' contract provides:

**7.7.1** If the Contract Documents, laws, ordinances, rules, regulations or orders of any public authority having jurisdiction require any portion of the Work to be inspected, tested or approved, the Contractor shall give the Architect timely notice of its readiness so the Architect may observe such inspection, testing or approval. The Contractor shall bear all costs of such inspections, tests or approvals conducted by public authorities. Unless otherwise provided, the Owner shall bear all costs of other inspections, tests or approvals.

Since Section 7.7.1 states "the Owner shall bear all costs of other inspections, tests or approvals," Airline contends that it is the owner's sole responsibility to pay for these consulting engineers. Barr contends that this expense was a reasonable and foreseeable result of Airline's failure to perform.

These inspections were not required by "the Contract Documents, laws, ordinances, rules, regulations or orders of any public authority" which, according to the contract, would be the contractor's responsibility. We believe this expense is covered by the contract provision that "[u]nless otherwise provided, the Owner shall bear all costs of other inspections. . . ." The award to the Barrs of $5,409.53 for this expense is set aside.

### Excessive Wall Covering

■ The trial court awarded $9,177.79 to Barr for excess wall covering delivered to the project. The Chancellor's finding of fact stated: "[I]t is true that an excess of material was delivered to the Project, the Court finds that Airline or its representative measured the Project and informed Barr as to the amount of material required, and that is the amount that was ordered." Airline argues that there was no proof to support this finding.

Joyce Barr testified that a representative of Airline came to her home and made the calculations as to the square footage that would be required for the vinyl covering. She stated that when she placed the order for wall covering she simply turned over the calculations prepared by Airline's representative.

Airline contends in their argument that they "offered uncontradicted proof that was corroborated by Joyce and William Barr themselves that Airline supplied them with the square footage of wall to be covered and that the amount of paper needed was decided by a wall paper supplier which they dealt with directly." Airline does not cite to the record to support this contention, nor has it shown us anything that might tend to disprove Barr's contention that Airline's representative gave Joyce Barr an incorrect figure. If the wallpaper suppliers provided Mrs. Barr wallpaper based on this incorrect figure, then the wallpaper amount would also be incorrect.

Based on Joyce Barr's testimony that Airline compiled the figures by which she

ordered the wallpaper, and the fact that the wallpaper ordered was an excessive amount, this proof was sufficient in and of itself to conclude Airline should be responsible for the excess.

### Building Valve Houses

■ Barr constructed "valve houses" for the project's sprinkler system at a cost of $4,005.36. Barr argues, and the trial court agreed, that these valve houses should have been constructed by Airline pursuant to the parties' contract. Under item 14 of exhibit C to the contract, Airline agreed to: "Add Automatic Fire Protecting System in accordance with approved shop drawings, all state and local codes." Airline contends that since the contract does not contain the actual term "valve houses" then they were not contractually bound to construct them.

Airline had a subcontract with Tri–State Sprinklers to construct the fire sprinkler system for this project. One of the items expressly excluded from this contract was the valve houses. James Tuttle of Tri–State Sprinklers stated that the valve houses were excluded because they normally belonged "to a builder and electrician, and that sort of thing." Additionally, Mr. Tuttle stated that the valve houses were an absolute essential if the sprinkler system was to be properly protected.

In light of the foregoing testimony, we believe the Chancellor correctly concluded that the valve houses were an integral part of the fire protection system and, thereby, included within the parties' contract. Even though the term *valve houses* was not expressly stated in the parties' contract, reason here requires an implied inclusion into the contract.

### Sprinkler Break Damage

■ The Chancellor awarded the defendants $2,265 for payments they were required to pay Superior Fire Protection Company to repair the sprinkler system after one of the pipes in it burst. There was conflicting testimony as to the cause of the burst pipes and Airline contends that the evidence preponderates against the Chancellor's determination.

Danny Jackson, an employee of Superior Fire Protection, testified that the cause of the bursting pipes was attributable to improper drainage in sprinkler lines. Mr. Tuttle testified that the pipes burst because the valve houses were not properly heated.

We do not feel it is necessary to resolve the conflicting testimony because as the Chancellor stated in his findings:

> It is not necessary to resolve this dispute because, in either case, the responsibility is that of Airline. If the damage resulted from freezing due to improper heating in the valve houses, it was the responsibility of Airline to construct and install proper heating in the valve houses, which it did not do, although Barr was charged for the heaters (improperly so as the Court has found in paragraph 9(b) above). If, on the other hand, the damage resulted from water being improperly left in the lines because they were not properly drained, that is a breach of Airline's warranty under paragraph 4.5.1. of the General Conditions that all of the work under the Contract "will be of good quality, free from faults and defect." Accordingly, all of these items are the expense of Airline and are disallowed.

■ Airline also argues that they should not be expected to pay for these damages because Barr chose to build them himself instead of negotiating a change order. We simply cannot agree with this analysis. Barr testified that he only constructed the valve houses after Airline refused to do so. Furthermore, Barr should not be expected to negotiate a change order for an item that Airline was already contractually obligated to perform.

### The Installation of the Trim to Cedrick's Lounge

■ The trial court awarded the defendant damages for installation and finishes of trim and woodwork in Cedrick's Lounge. Airline contends that they should not be required to pay this amount because it was

not mentioned anywhere in the parties' contract.

Barr testified that this work was part of the parties' contract. Barr stated that he finished up the lounge because Airline refused to do so. Barr testified that Airline even paid for the materials to finish the bar, which further indicates that it was Airline's obligation.

The plaintiff contends that the defendant's claim for damages should fail because they did not point out a specific provision in the contract that included this work. Additionally, Airline argues that Barr's statement that Airline paid for the materials for this work should be given little merit because he did not support it by documentation.

We feel the evidence offered by Barr was sufficient to establish his burden of proof, especially in light of the fact that the defendant has cited us to little countervailing evidence that was offered to contradict Barr's testimony.

### Stolen Fixtures

■ Barr was awarded $614.82 to replace some allegedly stolen and/or lost electrical fixtures. Airline contends that the proof was insufficient for Barr to be awarded this amount.

Barr himself testified as to these damages. Barr testified that he was required to pay Stuart C. Irby $614.82 to replace stolen "canned" lights that go into the ceiling and light bulbs. Airline argues that Barr had a storage barn on the premises and it was error for the trial court to award Barr damages when he did not prove that these items were not stolen out of his storage shed.

The trial court was justified in relying on Barr's testimony, especially when Airline offered no proof to contradict it. As the trial court stated:

Barr, as owner of the project, furnished certain electrical fixtures and delivered them to Airline or its subcontractor for custody before installation. When the time for installation arrived, the fixtures had been lost or stolen and Barr had to replace the same at a cost of $614.82, for which he is entitled to reimbursement.

### Repair Work to the Hot Water Boiler

■ The trial court awarded $218.45 for repair work done to the hot water boiler. Airline contends that since there was no proof as to whether the malfunction in the boiler was due to faulty installation or the water boiler itself, then trial court erred in awarding damages against them. Airline argues that if the defect was in the boiler itself then they should not be responsible for the repair work because it was accepted by the engineer of record.

The engineer of record for this project testified that he "believed" he approved the boiler even though it wasn't the brand listed in the specifications. He stated he felt this "brand" of boiler was "okay" for this job.

The damages in this case were awarded based on an invoice for repair work to the boiler dated May 26, 1988. There was no indication that these damages were based on an "improper brand." Airline's subcontractor (J & A Mechanical) either negligently installed or installed a boiler that malfunctioned. Either way Barr can look to Airline for damages as a result thereof.

Airline also alleges that J & A Mechanical should be responsible for these damages under its warranty and/or the damages should "flow through" to J & A. Again, there is no indication that this issue was raised at the trial court and we shall not address it here.

### V.

Whether the trial court erred in awarding the Barrs $75,000.00 for attorney's fees.

Barr was awarded $75,000 in attorney's fees by the trial court. Airline contends that Barr should not be allowed to recover these fees because (a) Airline did not breach their contract, (b) there was no proof that the hours submitted by Barr's counsel excluded time related to the alleged "oral agreement", and (c) the amount of fees awarded is in excess of the hours

billed and expenses incurred by Barr's counsel.

### (a)

Section 4.18.3 of the supplemental condition of the parties' contract provides:

The obligations of the Contractor under this paragraph, 4.18, shall not extend to liability of the Architect, his agents or employees arising out of the preparation of and approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, but, shall specifically include all claims, damages, losses and expenses, including attorney's fees, arising out of or relating to construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work and the Contractor's failure to carry out the Work in accordance with the Contract Documents, notwithstanding the Architect's on-site observations of such.

Airline contends that they carried out the work in accordance with the parties' contract documents, both with regard to quality and timeliness.

After a thorough review of the record, we cannot agree with Airline's contentions. Although we concluded that Barr was responsible, in part, for the delay in the project, they were by no means the sole cause of Airline's untimely performance. There is sufficient evidence to conclude that Airline caused many of the delays themselves or experienced such due to their subcontractors on the project. The trial court stated several delays that were attributable to Airline and we do not find that the evidence preponderates toward the contrary.

For example, Airline was delayed two to three weeks because one of Airline's subcontractors ran out of wood roofing shingles. Tom Stickles of Harris Construction Company testified that they were delayed approximately three days because they had to correct an error in the grading work. Airline incurred further delays in waiting on deliveries from Millwork Suppliers. Additionally, they were delayed due to Airline's subcontractors hindering the progression of the project by their slow performance. The project was also delayed due, in part, to an inadequate supply of tools and materials to the craftsmen and incorrectly installed work that had to be redone.

Based on the foregoing it is apparent that Airline did not perform this contract in a timely manner and, furthermore, as we have indicated throughout this opinion, damages for incomplete and/or incorrect work was also appropriate in this case.

### (b)

█ Airline contends that Barr should not be awarded $75,000 in attorney's fees because Barr's counsel did not submit proof that the hours they submitted did not include work done on the alleged "oral agreement."

We find that the defendant did submit proof of this fact. Sidney W. Spragins, counsel for defendant, filed an affidavit which stated:

During that period I have expended 287 hours on the case excluding all time related to the issue of liability of Airline Construction, Inc. ("Airline") in respect of its promise to deliver the rental units in six months.

This affidavit, absent any countervailing proof by the plaintiff, was sufficient proof for the trial court to conclude that the 287 hours did not include counsel's hours spent on the alleged "oral agreement."

### (c)

█ Barr's counsel, Spragins, filed a list of hours they expended on this case. When these hours are multiplied by the highest requested hourly rate, they only amount to $52,716. Mr. Spragins also filed an affidavit that claimed he incurred $3,259.43 in expenses. These two amounts added together are $19,024.57 less than the trial court award. Airline contends that this $19,024.57 premium was awarded for this appeal and, therefore, premature.

It is premature for a trial court to award a party attorney's fees for an appeal prior to that appeal being perfected. *Evans v. Evans*, 558 S.W.2d 851 (Tenn.Ct.App.1977);

*See Chaille v. Warren*, 689 S.W.2d 173, 178 (Tenn.Ct.App.1985). "[T]he proper time and place to request attorneys fees for services performed on appeal is on remand in the trial court." *Chaille v. Warren*, 689 S.W.2d at 179, citing *Folk v. Folk*, 210 Tenn. 367, 379, 357 S.W.2d 828, 829 (1962).

Included in Mr. Spragins' list of itemized hours spent on the case, Spragins also states:

> Our services to the Barrs in connection with this matter are clearly not completed inasmuch as Airline and/or Ohio Casualty Company may appeal the judgment of this Court, which will require considerable additional time and effort.

The trial court's findings of fact and conclusions of law stated:

> The Court finds that, based upon its knowledge of this case, the preliminary pleadings and motions that have been filed and heard, the detailed discovery accomplished by all parties, the ten days of diligent trial, and the post-trial efforst [sic] of counsel, Barr has incurred *or will incur* substantial attorneys' fees for which Airline is liable under the Contract. (Emphasis added)

The parties in this case have not cited to any other proof that was offered to support this award of $75,000 other than this affidavit. The only other factor that was stated in Spragins' affidavit, other than the hours he set out, upon which an award of fees could be based, was the mention of a possible appeal.

We are aware that normally the trial court's award or determination as to attorney's fees is largely in the discretion of the trial court, *Vanhooser v. Cunningham*, 24 Tenn.App. 480, 146 S.W.2d 840 (1940); *Riley v. Riley*, 9 Tenn.App. 643 (1929), however, it was an error of law to make an award of such fees for future litigation.

It is apparent in light of the foregoing factors, that the $19,024.57 premium was prematurely awarded for this appeal. We conclude that the proper award should have been $55,975.43.

### VI.

■ Whether the trial court erred in refusing to award Airline $77,186.00 in damages for the extended project duration.

Airline contends the project was extended due to the numerous changes and delays caused by Barr. As a result of this delay, Airline alleges that they incurred additional expenditures in completing this project for which they should have been compensated.

Airline presented the testimony of Mr. Pearson, a scheduling expert of BBRL, Inc., concerning, among other things, the delay damage incurred by Airline. During the finish stages of this project Airline expended $149,292 in labor costs. Mr. Pearson testified that due to the conditions experienced by Airline there was a labor inefficiency of 20 percent; therefore, Airline incurred damages equivalent to $29,858. In addition, Mr. Pearson opined that it cost Airline an additional $28,731 to maintain its presence on the site and $18,597.68 in home office overhead, all due to owner-caused delays.

■ The trial court awarded Mr. Pearson's testimony little weight because he was of the opinion that his testimony was merely an "educated guess." Airline contends that since Mr. Pearson has 20 years of experience in the construction industry and his testimony went uncontradicted with the exception of Barr, Mr. Pearson's expert opinion should have been given considerable weight. The Chancellor was bound, according to Airline, to accept this expert's opinion as conclusive.

As we have noted previously, the Tennessee Supreme Court has stated that experts' opinions are not conclusive and need not be accepted as true. The experts' opinions are intended to be only advisory in character and the trier of fact may give it whatever weight it chooses. *Gibson v. Ferguson*, 562 S.W.2d at 189–190. *See Miller v. Alman Construction Company*, 666 S.W.2d 466 (Tenn.Ct.App.1983).

In order to recover damages they must be proven within a "reasonable degree of certainty." *Moore Const. Co. v. Clarksville Dept. of Electricity*, 707 S.W.2d 1, 15

(Tenn.Ct.App.1985); *Redbud Coop Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn.Ct. App.1985); *Buice v. Scruggs Equipment Co.*, 37 Tenn.App. 556, 267 S.W.2d 119, 125 (1953). Mr. Pearson even testified that some of these changes allegedly instituted by Barr were very difficult to evaluate. Pearson testified as follows:

In other words, don't put up that kind of door, I want a mahogany door. That kind of change can be evaluated very easily. But when we talk about the [e]ffect of the owner defining the work as the work goes along, the judgments about the [e]ffect of those things on construction become very judgmental, and the linkage, the common thread running from one of these events through to the [e]ffect on construction, becomes difficult to establish.

We'd like to be able to say I'm on this particular event on this number of days, this particular event from that number of days. We don't have the level of evidence to do that, but that's not uncommon in finish work. The cause and effect of these two are pretty easy to establish. But, when we have this group of changes, many of which were issued orally, and then the price for it was either agreed or disputed later, we just don't have a lot of records to depend on.

With all the foregoing in mind, we simply are not convinced that the evidence preponderates against the trial court's determination.

### VII.

Whether the trial court erred in refusing to award Airline the cost of the additional insurance coverage required and the cost of installing the underground sprinkler system.

The parties, pursuant to their contract, provided a mechanism by which changes in the project could be authorized and agreed to:

### 12.1 CHANGE ORDERS

12.1.1 A Change Order is a written order to the Contractor signed by the Owner and the Architect, issued after execution of the Contract, authorizing a change in the Work or an adjustment in the Contract Sum or the Contract Time. The Contract Sum and the Contract Time may be changed only by Change Order. A Change Order signed by the Contractor indicates his agreement therewith, including the adjustment in the Contract Sum or the Contract Time.

12.1.2 The Owner, without invalidating the Contract, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and the Contract Time being adjusted accordingly. All such changes in the Work shall be authorized by Change Order, and shall be performed under the applicable conditions of the Contract Documents.

In conformity with these provisions the parties had agreed to a change order which increased the contract price by $40,153. One of the items listed in the change order was an "Add for Sprinkler Underground" in the amount of $17,911. Both parties had agreed and signed this change order.

The trial court disallowed this "Add for Sprinkler Underground" and concluded that this change order should be reduced by $17,911. Airline contends that this item in the change order was necessitated by an additional cost for installing an underground system. The Jackson Utility District apparently told Mr. Barr that this underground system was necessary before they would hook up the water supply.

The trial court found that this item should not be an addition to the contract because it was already included in the original contract. The parties' original contract called for a fire protection system, and the Chancellor held that this included the cost of connecting the system to the water supply.

Item 14 of exhibit C to the parties' contract states: "Add Automatic Fire Protection System in accordance with approved shop drawings, all state and local codes." Airline alleges that this "underground system" was not required under any local codes.

Regardless, there is no need to resolve this controversy because there is no indication in the record that Barr's signature was obtained through coercion, deceit or fraud. The contract provided a means for the parties to amend the contract and add additional work. These provisions should be upheld. The trial court offered no legal proposition for disregarding the parties' contract, and we see no justification for doing so.

■ Although Barr argues that it was trade custom for contractors to consider this cost when figuring their bid, this testimony is irrelevant because the contract and the change order are both unambiguous. The parties' contract should not have been disregarded and the trial court was in no position to rewrite it. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578 (Tenn.1975); *see Southern Roofing and Petroleum Co. v. Aetna Ins. Co.*, 293 F.Supp. 725 (E.D.Tenn. 1968); *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28 (Tenn.1984); *see also, P. & M.J. Bannon v. Jackson*, 121 Tenn. 381, 117 S.W. 504 (1908).

■ Airline also contends that the trial court erred in failing to award them $10,-260 for the cost of additional insurance coverage. Pursuant to the parties' contract, Airline was required to maintain umbrella liability insurance in the amount of $5,000,000. After the signing of the contract the parties learned that Sheraton Corporation required $10,000,000 in liability insurance.

The trial court concluded:

13. Under the supplementary conditions of the Contract contained in Section 00810 of the Specifications, Article 11 "Insurance" paragraph 11.1.4, Airline was required to have umbrella liability insurance coverage with a combined single limit of $5,000,000.00. After the Contract was signed, Barr learned that the Sheraton Corporation (who was to issue a franchise for the operation of the Project) required umbrella coverage of $10,000,000.00. Airline did acquire the additional coverage and Barr paid to Airline's agent, the Crump Company, $14,-

878.50 against the cost of the additional coverage. Airline now seeks to recover the additional sum of $10,260.00. The Court finds that after the Contract was signed, Airline had in force only $1,000,-000.00 of umbrella coverage. Accordingly, the cost of acquiring the next $4,000,-000.00 of coverage should properly be borne by Airline. Airline bases its claim for the additional amount upon Trial Exhibit 71. That exhibit reflects that Airline's cost of the second $5,000,000.00 of coverage from September 24, 1986 to February 15, 1987 was $7,980.00. Airline also purchased an additional $5,000,-000.00 of coverage from February 15, 1987 to February 15, 1988 at a cost of $10,605.00; however, the Court finds that since the Project was completed in July of 1987, Airline should have cancelled that coverage after six months and if it did not, the additional cost should be borne by Airline. Accordingly, Barr should only be charged with $5,302.50 in respect of umbrella coverage through August 15, 1987. The aggregate of the proper amount for which Barr should have been charged was $13,282.50. Since Barr has paid $14,878.00, he has in fact been overcharged in respect of the umbrella coverage by $1,595.50. Accordingly, Airline's claim for $10,260.00 for the umbrella coverage is disallowed.

Airline argues that Barr verbally agreed to pay for all but $5,000 of the insurance costs. The alleged verbal conversation was noted in a letter from Jerry Moore to Barr. The parties did not, however, enter into a signed writing or issue a change order.

The letter that Airline refers to also states: "Should the above concur with your understanding we would ask that you initial in the space provided below to indicate your approval, and return to our office." We find no evidence that this letter was ever initialed or approved by Barr.

After reviewing the record, we conclude that the trial court's determination was proper in all respects.

## VIII.

■ Whether the trial court erred in finding that Item 8 of Exhibit C to the

contract provided for room 221 to be the standard for all purposes for the new rooms.

Airline requested $6,177 for alleged extra work they were required to perform beyond the specifications. Specifically, Airline sought $1,058 for the installation of vinyl wall covering in 68 rooms, $452 for the labor cost that was required to remove closet shelves to install the wall covering, and $4,667 for the extra cost of the bathroom doors which were allegedly more expensive than those required in the specifications.

The aforesaid items were disallowed under item 8 of exhibit C to the parties' contract which states:

8. A trim package to match existing and as briefly described is to be [$] 74,794.00
included. All trim to be stain grade fir. All hollow metal door frames visible to the public to receive wood trim. False beams and related trim to be installed at ± 6′-0″ o.c. throughout commercial corridors, ceilings at ± 15′-0″ o.c. throughout rental unit corridors, and in a layout similar to the existing lobby these beams to be installed in the new coffee shop.
All other trim including base, chair rail, crown mold and etc. to be installed in similar locations in new additions as is in existing. <u>Room # 221 of existing to be standard of all new rooms</u>, 2nd floor corridor to be standard of new rental unit corridors and 1st floor corridor and lobby to be standard at commercial areas and passage ways. (Emphasis added)

---

The Chancellor concluded that the wallpaper and doors were not of any higher quality than those in room 221. The basis for this reasoning is that since Airline knew that room 221 was the standard for all rooms, then they were contractually bound to supply these items.

Airline argues that this contract provision only related to "wood trim" whereas Barr contends that it applies to all aspects of room 221. While Airline alleges that this provision clearly by its own terms only refers to wood trim, we are not convinced.

This provision says "[a]ll other trim ... etc. ... Room # 221 of existing to be standard...." This provision does not by its own terms set forth a clear meaning of its purpose. The trial court here was simply faced with the task of resolving conflicting testimony as to the appropriate interpretation to be attached to this provision.

When evidence is conflicting and contradictory such as the issue here then witnesses' credibility is of the utmost importance. The Chancellor here was in a much better position to judge the veracity of these witnesses, and we are not convinced that the evidence is to the contrary. *Browder v. Hite,* 602 S.W.2d 489 (Tenn.Ct.App.1980).

Furthermore, as we have noted, the parties' contract provided a means whereby changes in the work or extras could be added if required. If this were indeed an extra item that required Airline to expend additional sums then change orders could have been issued or Airline could have refused to perform them. *See P. & M.J. Bannon v. Jackson,* 121 Tenn. 381, 117 S.W. 504 (Tenn.1908).

## IX.

Whether the trial court erred in unilaterally and without proof reducing items requested by Airline.

Airline requested $2,890 for additional installation that was required to be installed in a meeting room in the hotel. This extra installation was required as a result of changing the ceiling configuration from a flat acoustical to a sheetrock. Airline also requested $3,054 for adding two walls to a coffee shop.

The trial court felt that these items were unreasonable and/or unsubstantiated and awarded $870 or 20 percent for the installation and $2,445 or 80 percent for the walls in the coffee shop. Airline contends that

since Barr introduced no proof that the amounts Airline requested were unreasonable, then the trial court erred in reducing the award.

The only evidence that Airline offered as proof of these damages was a letter with handwritten notations of these amounts and a letter written by Jerry Moore to Barr requesting these additional costs.

When proving damages, the evidence should "lay a foundation enabling the triers of the facts to make a fair and reasonable assessment of damages." *Wilson v. Farmers Chemical Ass'n.*, 60 Tenn. App. 102, 444 S.W.2d 185, 189 (1969). Although the law does not require Airline to prove the amount of damages with "mathematical certainty," *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn.Ct.App.1983), or "exactness of computations," *Provident Life and Acc. Ins. Co. v. Globe Indem. Co.*, 156 Tenn. 571, 3 S.W.2d 1057, 1058 (1928), Airline was required, however, to prove these damages with a "reasonable degree of certainty." *Moore Const. Co. v. Clarksville Dept. of Electricity*, 707 S.W.2d at 15; *Redbud Coop Corp. v. Clayton*, 700 S.W.2d at 561; *Buice v. Scruggs Equipment Co.*, 267 S.W.2d at 125.

Airline had the burden to prove these damages with a "reasonable degree of certainty," and the trial court apparently did not feel that Airline met this burden and, therefore, reduced the award. We see no proof in the record that convinces us otherwise.

### X.

Whether the trial court erred in refusing to award Airline damages regarding the many consultants on the job.

Airline argues that they should be reimbursed for $1,510 they paid to B & G Electrical and $2,463.60 they paid to Jetz Mechanical. Airline paid B & G and Jetz to "run the punch list" of NJC, Inc. NJC, Inc. was a consultant Barr hired to identify any deficiencies in the project. Basically Airline paid B & G and Jetz to correct deficiencies that existed in the project. Airline contends that they were only re-

quired to "run" punch list prepared by the project architect or engineer of record.

We simply cannot agree with this reasoning. Airline had a contractual obligation to perform the contract. If there were defects in their performance, they had a choice to either correct the deficiencies or risk breaching the contract. Airline chose to "run" the punch list of the consultants hired by Barr and now seeks recovery for doing so. These damages are simply not allowable.

Airline also seeks recovery of $500 they paid to James R. Lyles. Mr. Lyles is an electrical engineer Airline hired to do an inspection of the electrical work. Airline alleges that Mr. Lyles was paid to do this inspection because Jenovetz, the electrical engineer of record, was no longer on the project. Airline argues that this cost should have been incurred by Barr.

We find this argument without merit. Absent any proof to the contrary, this was nothing more than a voluntary payment on the part of Airline which Barr did not request. Barr is not responsible for these damages.

### XI.

Whether the trial court erred in denying Airline damages for additional amounts expended in performing work beyond the scope of its contract.

Airline contends that the trial court erred in failing to award them damages for work they performed beyond the scope of the contract:

### New Air Distribution Grill

Airline sought to recover $2,343 for a new air distribution grill installed in the commercial building. These grills were necessitated by a change in the ceiling from acoustical to sheetrock. The trial court found that this expense would not have been necessary if Airline had timely notified its subcontractor, J & A, of the change in the ceilings. J & A apparently ordered the grills pursuant to the original plans because they had not been notified of the ceiling change.

Airline argues that there was no proof at trial as to when these grills were ordered or what amount of notice to J & A would have been required to avoid this expense. Airline eludes the fact that the burden of proof was on them, not Barr. Barr testified that Airline knew about this change right after the project began and well in advance of construction to the commercial building. It is evident that Airline simply did not carry their burden as to these damages.

### Removal of Door Frames

▆ Airline sought $328 for moving a kitchen door frame. The trial court disallowed this item and held that this expense was offset by the elimination of four doors for which Barr received no credit.

Jerry Moore, an Airline employee, testified that Barr was, in fact, given credit in the amount of $903 for these doors. The credit was allegedly given in the change order which both parties signed and made part of the contract. It is Airline's position that since this credit was given on the change order then the trial court should not have offset their damages for such.

After reviewing the information Airline has cited, we are simply unable to ascertain whether or not this credit was for the elimination of these four doors. A letter dated April 29, 1987, states: "Delete furnishing and installing (1) pair doors (marked (9)), frame related trim and finishing." With all the many changes and additions to this project, Airline has not shown that this credit is the same credit that the trial court was referring to in its findings and conclusions.

### Labor to Install Pool Deck and Wood Block

▆ Airline requested $385 for labor expense they incurred for installing a pool deck and $1,036 for the installation of wood blocks. The trial court held that this expense should be offset by the savings that occurred as a result of the elimination of 360 feet of concrete sidewalk and the deletion of a "super structure."

Airline argues that Barr did not prove that these items were deleted from the contract, or that he was given a credit for such or even what amount the credit should have been. Airline's argument is not supported by any citations to the record. See Rule 27(a)(7) T.R.A.P. and Court of Appeals Rule 6. This Court is not under a duty to minutely search a voluminous record to verify unsupported allegations in a brief. *Schoen v. J.C. Bradford & Co.*, 642 S.W.2d 420, 427 (Tenn.Ct.App. 1982).

### Paint Labor

▆ Airline sought to recover $7,500 for paint work they were required to expend allegedly at the request of Barr. Airline argues that this item should be recoverable because Barr did not prove these items were included in his contract.

▆ The burden here was not on Barr but on Airline. The proof here is inadequate to ascertain whether these items were included in the contract price or whether they were merely additions or extras which were added by Barr. Airline contends that a letter written to Airline from Hart's Painting Company clearly shows that these paint items were not included in the parties' contract. After reviewing Hart's letter we are not persuaded by Airline's contentions. The Hart letter only actually points to one section in the parties' contract that an item allegedly contradicts. Airline simply failed to carry their burden with regard to these damages.

### Door Sweeps, Broken Mirrors, Leaded Glass

▆ Airline requested $368.44 for the cost of door sweeps, $666 for the replacement of broken mirrors, $1,583 for the addition of leaded glass. The trial court denied the claim for door sweeps because it concluded that Airline had cut the doors too short, which necessitated the need for these sweeps. The Chancellor concluded that the mirrors were broken during installation or prior to Airline's completion of the project so Barr was not responsible for reimbursement. Additionally, the Chancel-

lor disallowed the leaded glass expense because the specifications called for this in some windows and doors.

Airline points out that there was a statement made at trial that these doors were cut short because the carpet was higher in the hallways than in the rooms and therefore the door sweeps were necessary. Airline contends that this statement should convince us that the evidence preponderates against the trial court's determinations. We simply cannot say that the proof was contrary to the Chancellor's conclusions based on this one statement. The trial judge was in a much better position to judge the veracity and credibility of these witnesses and we shall defer to such.

 Airline argues that, since the broken mirrors were not included in the architect's final punch list, then these mirrors were not broken at the completion of the project. However, there was also testimony introduced at trial which indicates that items can be overlooked when these punch lists are prepared.

The Chancellor's findings and conclusions also disallowed the alleged additional leaded glass. Leaded glass was always specified in the plans for *some* doors and windows and Airline does not dispute this fact. Airline argues that additional amounts, beyond the "some", were required. Airline also argues that Barr never introduced proof to quantify the term "some." However, once again, Airline overlooks the fact that the burden of proof was on it and not Barr.

Airline argues that the evidence on these items clearly preponderates against the trial court's determination that these damages should be disallowed. Airline does not, however, offer proof to substantiate these allegations. We are not convinced that the trial court's determination was in error as to these damages.

It results that the recovery awarded Barr by the Chancellor in the amount of $210,940.00 "for deficiencies not correctable" and the $57,000.00 awarded for penalty is reversed. The $5,409.53 awarded Barr is reversed. The amount owed Airline by Barr under the contract and pursuant to

the change orders thereto is increased by $17,911.00 from $93,222.90 to $111,133.90. The sum of $69,028.40 awarded Barr for breach of oral contract is reversed.

The amount of attorney's fees awarded Barr against Airline is modified by reducing the amount from $75,000.00 to $55,975.43.

The judgment of the trial court is otherwise affirmed and the cause is remanded.

The costs of this appeal are taxed one-half each to Barr and Airline, for which execution may issue if necessary.

CRAWFORD and HIGHERS, JJ., concur.