## IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

FILED

April 22, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

GEORGIA CROSS and )
NEWMAN CROSS, )
 )
    Plaintiffs/Appellees, ) Shelby Circuit No. 72984 T.D.
 )
VS. ) Appeal No. 02A01-9807-CV-00199
 )
CITY OF MEMPHIS, )
 )
    Defendant/Appellant. )

APPEAL FROM THE CIRCUIT COURT OF SHELBY COUNTY
AT MEMPHIS, TENNESSEE
THE HONORABLE GEORGE H. BROWN, JR., JUDGE

JONATHAN E. SCHARFF
BRETT A. HUGHES
HARRIS, SHELTON, DUNLAP & COBB, L.L.PC.
Memphis, Tennessee
Attorneys for Appellant

CANNON F. ALLEN
MONTE B. SERNEL
ARMSTRONG ALLEN PREWITT GENTRY
JOHNSTON & HOLMES, PLLC
Memphis, Tennessee
Attorneys for Appellees

AFFIRMED

ALAN E. HIGHERS, J.

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J.

    Defendant City of Memphis ("City" or "Appellant") appeals the judgment of the trial

court awarding Plaintiff Georgia Cross ("Mrs. Cross" or "Appellee") the sum of $130,000 for loss of enjoyment of life, permanent physical disability and pain and suffering arising from a slip and fall at a Memphis public library, and awarding Newman Cross ("Mr. Cross" or "Appellee") $118,300 for his past and future loss of consortium and services of his wife, Mrs. Cross ($39,500 past loss, $78,000 future loss) .

## I. Factual and Procedural History

Mrs. Cross visited the Memphis City Library known as the Poplar/White Station Public Library, with her four children, ages ten, seven, five and one, on November 28, 1994. Mrs. Cross had been visiting this library since she was a child and had been going to this library for the children for a four-year period preceding the accident.

The walk ramp at the library was built in 1981 and was not changed since that time other than the addition of a hand rail. The walk ramp ran in a downward slope from the front entrance of the library to the base of the walk ramp. The ramp had curb cuts that extended on both sides at the foot of the walk ramp and each curb cut was painted yellow. The City of Memphis stipulated that the yellow painted curb cut was not in compliance with the City's construction code.

Mrs. Cross parked her vehicle along the yellow painted curb cut. As she exited her car, along with her four children, Mrs. Cross cut across the grass but noticed the handrail had been placed on the west side of the ramp. She thought this was to keep people from cutting across the grass, so she proceeded directly to the walk ramp. Mrs. Cross was holding her youngest child on her right hip as she approached the walk ramp. As she stepped up on the yellow curb cut with her right foot, her foot slid and her ankle immediately gave and broke. Mrs. Cross broke her ankle in three places. She was bedridden for months after the accident and now has traumatic arthritis with a great deal of pain.

2

On September 27, 1995, the Crosses filed a negligence action against the City under the Tennessee Governmental Tort Liability Act (the "GTLA"), Tenn. Code Ann. §29-20-101. Mrs. Cross sought damages for her slip and fall and Mr. Cross sought damages for loss of consortium and future loss of consortium.

In July of 1997, three and one half years after the accident, but before the trial in this matter, Mr. Cross was diagnosed with Amyotrophic Lateral Sclerosis (ALS), a fatal illness commonly known as Lou Gehrig's Disease. The disease causes the muscles to deteriorate throughout the body of the affected individual, and generally allows for a life expectancy of two to five years without the aid of a ventilator and feeding tube. Although it is not possible to predict the length or time period that the disease will progress in Mr. Cross, at some point in time he will be bed-ridden and eventually placed on a respirator to assist breathing. At some point he will need 24 hour assistance to help him with his daily routine.

The case was tried without a jury on May 12 and May 13, 1998. The trial court found that the City negligently maintained a latent defect at the library, the City's immunity was removed and the City was on notice that the curb cut was in a defective and dangerous condition before Mrs. Cross injured her ankle. The trial court found the City to be 100% at fault and awarded Mrs. Cross $130,000 for her injury.

The trial court awarded Mr. Cross $39,500.00 for his loss of consortium damages for the period of time between the accident and the trial. The court also awarded Mr. Cross $78,000.00 for future loss of consortium, finding that Mr. Cross will need care in the future that Mrs. Cross will be unable to provide because of her ankle injury. This appeal by City followed.

## II. Apportionment of Fault

3

After considering all the evidence at trial and the entire record in this case, the trial court made the following findings of fact with regard to fault:

> 2. The curb cut where the plaintiff fell was located in close proximity to a handrail which the City had installed prior to the accident date. The curb cut, handrail and ramp area were dented [sic] a hazardous condition.
> 3. The area where plaintiff stepped was hazardous to pedestrians as a result of three elements: (a) The City of Memphis installed the handrail next to the curb cut which invited patrons to step on the defective curb cut; (b) The parties stipulated that the curb cut and ramp area did not meet the specifications of the Tennessee Building Code in that they were substantially too steep; and (c) The curb cut was constructed with pea gravel which was a slick and would polish over time.
> 4. The City was on notice that the curb cut was hazardous before Mrs. Cross fell and injured herself. Prior to her injury, other patrons had fallen on the ramp and in the area of the curb cut. The City admitted that the curb cut did not comply with the Tennessee Building Code at the time that the curb cut was installed. The hazardous condition was not obvious. It was a latent condition not obvious to patrons.

The trial court then found that: (1) The City had a duty to Mrs. Cross to maintain its premises in a reasonably safe condition; (2) The City breached that duty because the curb cut, ramp, and handrail combined to create a dangerous and defective condition; (3) The City was on notice of the latent, dangerous and defective sidewalk and therefore the City's immunity was removed; (4) The negligence of the City was the sole cause in fact and the proximate cause of the injuries to Mrs. Cross and the loss of consortium suffered by Mr. Cross; and (5) Georgia Cross was not at fault in any way in connection with her injury. She maintained a reasonably safe look out to protect herself from injury. The defective and dangerous condition was not obvious.

On appeal, the City contends that Mrs. Cross failed to use reasonable care under the circumstances and accordingly, she was at fault for more than 51% of the accident based on Tennessee's comparative fault law, and should be barred any recovery. The City argues that Mrs. Cross was familiar with this walk ramp as she had visited the premises for years prior to her fall. The City contends that the yellow paint on the curb cut distinguished it from the rest of the walk ramp. The City argues that Mrs. Cross failed to exercise the necessary precaution and to maintain awareness of where she was stepping while carrying a 33-pound, one-year old child in her arm. The City points to Mrs. Cross's

4

testimony that she was watching her children run ahead of her.

This matter was tried to the court without a jury. A trial court acting as trier of fact has considerable latitude in allocating percentages of fault to negligent parties and appellate courts may alter those findings if they are clearly erroneous. Coln v. City of Savannah, 966 S.W.2d 34, 44 (Tenn. 1998). After hearing all the evidence in this matter, the trial court assessed the negligence of the parties at 100% fault to the City and 0% fault to Mrs. Cross. This Court will alter this allocation of negligence only upon finding that the apportionment of the trial court was clearly erroneous.

At trial, Mrs. Cross testified that she was not in a hurry and she was paying attention to where she was going. On cross examination, Mrs. Cross stated, "I obviously looked to see where to step to know to step up. I knew where my children were, but not necessarily distracted by what they were doing that I didn't know where the handrail was." Mrs. Cross testified that she noticed the yellow on the curb but it had no particular meaning to her other than possibly meaning not to park there. Plaintiff's expert, William Beaty, testified that there were no regulations or specifications which state what the color yellow means.

There is evidence in the record that the City knew the curb cut was defective and dangerous. Carol Share, the Poplar/White Station library manager, complained on various occasions to library management about patrons falling at the curb cut. Merle Richardson, the Assistant Director for Support Services for the Memphis and Shelby County Library System, admitted that the handicapped ramp area was causing patrons to fall. Dan Jones, the Facility Manager for the library system, had been charged with the responsibility, prior to Mrs. Cross's injury, of investigating the curb cut and determining why it was dangerous and defective, and how it should be fixed. Additionally, expert William Beaty stated that, "I don't think the average person would see that there's a danger there . . . It's not an obvious hazard."

There was testimony that the City decided to place a handrail in the center of the

5

ramp to encourage patrons to stay away from the yellow caution curb points. Installing a center rail would require the City to drill through concrete. Installing a handrail in the soil next to the curb cut was considered "easier," safer for city employees and more "aesthetic." Therefore, the City installed the handrail adjacent to the curb cut. The handrail was installed approximately five days prior to Mrs. Cross's injury. This location of the handrail effectively drew patrons back to the defective area, rather than away from it. Additionally, the location of the handrail tended to prohibit patrons from walking across the grass to avoid the curb cut. The City admitted that the curb cut and ramp were too steep and out of compliance with the Tennessee Code.

Upon our careful review of the evidence in the record and the presumption of correctness afforded, this Court finds that the apportionment of fault by the trial court was not clearly erroneous. The trial court's apportionment of fault is affirmed.

### III. Loss of Consortium

The trial court awarded Mr. Cross $118,000.00 for past and future loss of consortium ($39,500.00 past, $78,800.00 future). The City contends that the trial court erred in setting the amount of damages at $39,500.00 for loss of consortium from the time of the injury to the time of trial, and erred in granting Mr. Cross any award for future loss of consortium.

The amount to be awarded in personal injury cases rests largely in the discretion of the trier of fact. Coakley v. Daniels, 840 S.W.2d 367, 372 (Tenn.App. 1992). The amount allowable as damages for personal injuries in tort actions is not measured by fixed rules of law, but rests largely in the discretion of the trier of fact and is entitled to great weight in the appellate courts in the absence of a showing of fraud or corruption. Id.

The trial court awarded Mr. Cross the sum of $39,500.00 for his loss of consortium up to the date of trial. The court arrived at that figure by finding that Mr. Cross was entitled

to $11,000.00 per year as damages for loss of consortium. Since Mrs. Cross's injury occurred approximately three and one-half years prior to trial, the court determined Mr. Cross's loss of consortium amounted to $39,500.00.

The trial court also awarded Mr. Cross the sum of $78,800.00 for his future loss of consortium. Mr. Cross was diagnosed with Amyotrophic Lateral Sclerosis (ALS), which causes deterioration of the patient's muscles and nervous system until death. Mr. Cross's future loss of consortium claim for damages arises from the loss of his wife's services in assisting him as his condition deteriorates.

In Moyer v. Herman, No. 87-119-II, 1987 Tenn.App. LEXIS 3208 (Tenn.App., August 12, 1987), the term consortium was explained as follows:

> The term . . . has developed to include the right of the wife to the society and comfort of the husband, and is now used interchangeably to denote the affection, aid, assistance, companionship, comfort, and society of either spouse; and as thus employed the term has been defined as, those duties and obligations which by marriage both husband and wife take on themselves toward each other in sickness and health; conjugal affection; conjugal fellowship; conjugal society and assistance; the conjugal society arising by virtue of the marriage contract; the consort's affection, society, or aid; the person's affection, society or aid; the person, affection, assistance, and aid of the spouse. The loss of consortium is the loss of any or all of these rights.
>
> From the above, it appears that damages for loss of consortium arise when the wife is deprived of the company, companionship and assistance of the husband in all those matters in which the husband would have benefitted the wife if he had not been injured.
>
> In view of the recent statutory and judicial pronouncements on the subject of the equality of spouses, the rights of consortium need to be redefined to produce an equality of these rights, that is, the rights of the husband and the wife to consortium should be identical.

Id. at *18-*19.

The City argues first that the evidence preponderates against the award of loss of consortium damages in the amount of $39,500.00 to Mr. Cross for the three and one-half year period between the injury and trial. The City also asserts that the evidence

7

preponderates against the award of future loss of consortium damages in the amount of $78,000.00 to Mr. Cross and argues that there is no legal authority in Tennessee for awarding damages for such a claim. We shall first address the award of past loss of consortium damages.

The record contains the testimony of Mrs. Cross and Mr. Cross regarding the effects the injury had upon their lives. For the first few months after the injury, Mrs. Cross was not allowed to put any weight on her ankle. She was instructed to keep it elevated for six weeks. Mrs. Cross was in a wheelchair after the injury, and later walked with the assistance of crutches. The cast was taken off on February 6, 1995 and she then wore a Bledsoe boot for some time. Mrs. Cross testified that the first 18 months were consumed with the ankle.

Mrs. Cross testified that after the injury she was unable to walk up stairs to her bedroom so Mrs. Cross and her husband converted a downstairs room into a bedroom. Mrs. Cross testified that she was unable to care for Mr. Cross during the first few months after the injury. She recalled not being able to attend holiday parties, only attempting to attend the Christmas programs of the children.

Mrs. Cross testified that after her cast was removed on February 6, 1995 her ankle remained stiff, swollen and painful for months. She slept with her ankle above the covers because the pressure of the covers caused her discomfort. By August 1995, her mobility in the ankle was very limited and she was not able to do many things she used to do. Mrs Cross testified it remains painful to ride a bike, drive a car, walk on sand, play tennis, ski, walk up and down stairs, walk on a driveway or any slanted surface, and she can not walk while carrying her youngest child. She testified that her ankle has not returned to normal. She testified further that her life has never gotten back to normal after this accident in terms of keeping the house. She is not able to do all of the things she could do before the accident. The more she tries to keep up with her schedule, the more pain and swelling she has.

8

Mr. Cross testified as to the problems Mrs. Cross has had and how her injury damaged their marital relationship. He testified that the first five days when Mrs. Cross was in the hospital were absolute chaos and things were about the same when she came home from the hospital. Mr. Cross testified that during the period of time from November 28, 1994 through May 1995, his wife was in pain 24 hours a day and he and his wife were not able to tend to each other marital needs. He testified there were holiday activities that he and his wife would have attended but for the injury.

According to Mr. Cross, Mrs. Cross slept downstairs for three to four months while he slept in their bedroom upstairs near the children. Mr. Cross couldn't recall if he was keeping his same hours at the office during that time because it was harder for him to be away because there was so much more he had to take on. Additionally, Mr. and Mrs. Cross did not have as much quiet time at the end of the day because with the disrupted routine, the children went to bed later and Mr. and Mrs. Cross were tired and went to bed earlier than usual. Mr. Cross would get up in the mornings and help the children get dressed and ready for school. According to Mr. Cross, the injury caused a great deal of stress for him and anger at the situation that he felt could have been avoided. There was stress between Mr. Cross and the children and stress at work as a continuation of that.

Mr. Cross testified that up through the date of trial, no day is easy for Mrs. Cross to get around on her ankle. He sees her ankle at the end of the day and it is generally swollen. He testified Mrs. Cross sleeps with her foot out from under the cover as the downward pressure of the sheet hurts her ankle. He testified that Mrs. Cross wears a brace on her ankle every day and she limps when she walks. He testified that life has never gotten back to normal for the two of them, though she tries to do the same kinds of things that she was able to do for him before the injury.

In this non-jury case, the trial judge's decision to award Mr. Cross damages for his loss of consortium hinges, at least in part, on witness credibility and should not be reversed unless there is found in the record clear, concrete and convincing evidence to the contrary.

9

Airline Const. Inc. v. Barr, 807 S.W.2d 247, 264 (Tenn.App. 1990).

The trial judge heard all the evidence and had the benefit of observing the parties as they testified. There is evidence in the record that Mr. Cross has been denied the company, companionship and assistance of his wife which he had before the accident. The evidence does not preponderate against the award of the trial court in the amount of $39,500.00 for past loss of consortium.

The trial court also awarded Mr. Cross the amount of $78,000.00 for future loss of consortium. In July, 1997 Mr. Cross was diagnosed with ALS. The progression of the disease is inevitable, devastating and fatal. Ultimately, Mr. Cross will be unable to walk or move himself at will. He will be confined to his bed and be completely dependant upon the assistance of others to care for him. Mr. Cross's future loss of consortium claim is based upon his wife's inability to assist him as his condition deteriorates due to her injury.

The City first argues that a claim for future loss of consortium is not recognized in Tennessee. We start from the general proposition that damages awarded in a personal injury action must compensate for future as well as past suffering, since the injured person can maintain but one action for his damages. Waller v. Skeleton, 212 S.W.2d 690, 700 (Tenn.App. 1948). In the case of Colonial Baking Co. v. Aquino, 103 S.W.2d 613 (Tenn.App. 1936), Mrs. Aquino was injured and Mr. Aquino sought damages for the loss of past and future services of his wife at his pressing shop. The appellate court found that the judgment awarded Mr. Aquino should be reduced, and that the sum of $5,000.00 would fairly compensate him for the present and *future* losses and expenses sustained. Id. at 623.

Tennessee Pattern Jury Instructions, while not themselves law, instruct the jury on the law governing the case and aid the jury in the determination of damages. Tennessee Pattern Jury Instruction 3-Civil 14.20 (1997) provides in pertinent part:

> If, in accordance with these instruction, you are to determine damages for the plaintiff (injured spouse) you should also

determine the damages for the plaintiff (<u>other spouse</u>). (<u>Other spouse</u>) would be entitled to recover the following elements of damage if established by the evidence:

3. The reasonable value of the injured spouse's services this plaintiff has lost [*and the present value of such services plaintiff is reasonably certain to lose in the future*;] and

4. The reasonable value of the spouse's companionship and acts of love and affection this plaintiff has lost [*and the present cash value of such acts plaintiff is reasonably certain to lose in the future*] but would have received in the usual course of the parties' married life.

<u>Id</u>. (emphasis added).

We can find no authority against the award of damages for future loss of consortium. The general rule is that damages awarded in a personal injury action must compensate for future as well as past suffering. Furthermore, the courts routinely instruct juries, in awarding damages, to determine the present value of services a spouse is reasonably certain to lose in the future. For these reasons, we find that it is not error for a trial court to award damages for future loss of consortium.

The City claims that even if this Court were to recognize a claim for future loss of consortium, the damages are purely speculative in this case. Tennessee law requires that damages for loss of an injured spouse's tangible services as an ordinary servant must be proved with exactness. <u>All v. John Gerber Co.</u>, 252 S.W.2d 138, 142 (Tenn.App. 1952). The City contends that Mr. Cross's claim that his wife, at some unknown point in the future and for some unknown duration in the future, will be supposedly unable to provide him assistance because of her ankle injury is too speculative.

In his videotaped deposition, Dr. Tulio E. Bertorini, M.D., testified that patients with ALS will need someone to help them dress and undress, to use the restroom, to get in and out of a wheelchair, to clean and bathe them and to give them medication. After the patient has a gastrostomy, the patient will need someone to feed them through the gastrostomy. When the individual requires a tracheotomy, they will need someone to suction the trach, clean the trach, deflate, inflate and hook the individual up to a ventilator. At this point, the

11

patient is generally bedridden and must be turned in the bed to avoid getting bedsores.

Dr. Bertorini testified that Mr. Cross has ALS. He testified that Mr. Cross will go through all of these stages as the disease progresses although ALS progresses at different rates in different people. He testified that Mr. Cross will, to a reasonable degree of medical certainty, need full time care. He testified that he expected Mr. Cross, to a reasonable degree of medical certainty, to be bed bound within two years of the date of his April 15, 1998 testimony.

Dr. Greer Richardson studied Mrs. Cross's ankle in August 1995 and determined that her ankle had developed traumatic arthritis as a result of her ankle fracture. Dr. Richardson testified that traumatic arthritis occurs when the cartilage space which cushions the joint is so badly traumatized that it begins to deteriorate and wear away. Ultimately, the cartilage disintegrates and the joint bones rub and wear against each other causing great pain, swelling and lost mobility. Dr. Richardson testified that in order to eliminate Mrs. Cross's right ankle pain, the joint will need to be fused. This will cause her to lose all mobility in her right ankle and may ultimately cause knee and hip injury.

The parties stipulated to the testimony of Nancy Wilson, an R.N. with Baptist Trinity Home Care agency and her videotaped deposition was made an exhibit. Wilson testified that a female can have the physical ability to provide care to a male patient with ALS. She testified that an ALS caregiver would need to have good body mechanics and have very good balance. To assist a patient from bed to wheelchair, the patient would put hands on the caregiver's shoulders. The caregiver would grasp the patient under the arms and help lift straight up and then pivot over and down in the chair. The caregiver is required to pivot during this process.

Wilson further testified that once the patient is no longer able to move at all for himself, dressing and bathing the patient is difficult because he has to be lifted. To feed an ALS patient, the caregiver needs to lift the patient to a sitting position. To change the

linens with the patient in bed, the caregiver has to roll the patient completely on the side and change the bed one half at a time. Wilson testified that to change the bed linens a caregiver would need good balance and strength.

According to Wilson, spouses can be trained to provide all this type of care and she has had occasion to train spouses of patients with ALS. Wilson testified that a woman with traumatic arthritis like Mrs. Cross would not be able to provide an ALS patient the custodial care he would need because the lack of mobility in the ankle makes the risk of injury to the patient too great.

Dr. Tulio Bertorini also testified that it is common for family members to care for ALS patients. Dr. Bertorini testified that Mrs. Cross would have otherwise had the intellectual ability to be trained to provide care to her husband. Dr. Richardson, Mrs. Cross's orthopedic surgeon, testified that in her current condition, Mrs. Cross cannot provide the type of assistance Mr. Cross will need as a result of his disease.

Nancy Wilson testified as to the costs of caring for a patient with ALS. An exhibit was introduced which laid out the ranges for cost of care for ALS patients as the patient's condition deteriorates. Depending upon the extent of care required, the cost ranges from $39,420.00 to $242,360.00 annually.

In granting Mr. Cross a judgment for future loss of consortium damages in the amount of $78,000.00, the trial court stated that it took a conservative view of those figures included in Exhibit 1 under custodial care. We agree with the trial court that Mr. Cross's future loss of consortium is not speculative. This Court finds that the evidence does not preponderate against the trial court's award of damages for future loss of consortium.

### IV. Conclusion

The judgment of the trial court is hereby affirmed. Costs of this appeal are taxed to

13

Appellant, for which execution may issue if necessary.

HIGHERS, J.

CONCUR:

CRAWFORD, P.J., W.S.

FARMER, J.