IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 21, 2002 Session

## MARGARETTE J. ADAIR, ET AL. v. VINCENT T. SCALF d/b/a V & T TOPSOIL, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 00-390-II    Claudia Bonnyman, Special Chancellor**

---

**No. M2001-00677-COA-R3-CV - Filed February 7, 2003**

---

This is an action to abate a temporary nuisance of dust and noise attributable to the removal, processing and sale of topsoil ostensibly incidental to the development of real property owned by the defendant Scalf adjacent to the residence of the plaintiff, and for damages. A declaratory judgment against the Metro Government that it failed to enforce its zoning regulations was denied. Metro Government cross-claimed for declaratory relief that Mr. Scalf's removal, processing and sale of topsoil on residential property was forbidden by Ordinance. This relief was granted. The judgment, as modified, is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified**

BEN H. CANTRELL, P.J., M.S., PATRICIA J. COTTRELL, J., AND JAMES L. WEATHERFORD, SR. J.

Larry D. Ashworth and Peter D. Heil, Nashville, Tennessee, for the appellant, Vincent T. Scalf.

David I. Komisar, Nashville, Tennessee, for the plaintiff-appellee, Margarette J. Adair.

Philip D. Baltz, John L. Kennedy and David Diaz-Barriga, Nashville, Tennessee, for the defendant-appellee, The Metropolitan Government of Nashville and Davidson County.

**OPINION**
**PER CURIUM**

**The Pleadings**

The plaintiff alleged that she owns and occupies as her residence a house and lot on West Hamilton Bend in Nashville, which is surrounded on three sides by a 73-acre tract owned by defendant Vincent Scalf, of which 70.19 acres are zoned for residential use, with the remainder zoned for commercial use. She alleged that in August 1995 Mr. Scalf was issued a grading permit

by The Metropolitan Government of Nashville and Davidson County (hereafter "Metro Government") to excavate and fill the "West Hamilton Borrow Site."

The complaint alleges that most of the acreage owned by Mr. Scalf is within a flood plain. Zoning regulations permit the "cutting down" of high ground in proportion to the fill requirements - balancing - and in order to develop the portion of his land zoned for commercial use substantial filling was required.

In 1996 Mr. Scalf commenced the removal and sale of topsoil from the residential acreage. He constructed a building thereon, advertising fill-dirt, sand, gravel, and mulch for sale. The plaintiff alleged that by 1998 Mr. Scalf was conducting a full-fledged topsoil business on residential property, for which the local Environmental Court issued a citation to him to show cause why he should not be enjoined from the practice. Following a hearing, an injunction was issued, but Mr. Scalf continued to sell topsoil, the removal and processing of which have caused the plaintiff discomfort and reduced the enjoyment and livability of her residence owing to the large quantities of dust generated by the operation.

The plaintiff sought a declaratory judgment that the "mining extraction" and sale of topsoil is unlawful, and that the Metro Government has failed to enforce its zoning laws.

In another Count the plaintiff alleges that Mr. Scalf created and maintained a public and private nuisance by mining and removal of topsoil in violation of zoning laws.[1] A declaratory judgment that the Metro Government "failed to enforce its zoning laws grading permit requirement" was sought, with no other relief demanded.

Mr. Scalf admitted that he removed and sold topsoil from the residential tract. He averred that he submitted a developmental plan for the commercially zoned property to the Metro Government, which issued him a grading permit in August 1995. He affirmatively pleaded the three-year statue of limitations applicable to permanent nuisances.

The Metro Government admitted that it issued a grading permit to Mr. Scalf in August 1995 which allowed "changes in the topography. . . ." Metro averred that "mineral extraction" is not a permitted use in property zoned residential, and further responded that its Codes Department had building plans indicating that Mr. Scalf was pursuing development of a portion of the property located at 3603 West Hamilton Road in preparation for construction of an office building. It is admitted that, in order to develop land within the flood plain, such land must be filled to a point above the flood elevation of the flood plain, which upon information and belief, would in this instance require approximately 15 feet of fill. No building plan was submitted prior to the issuance

---

[1] The thrust of the complaint is directed to and focused on the removal and sale of topsoil only, with slight reference to the dust thereby generated, as contrasted to the weight of the evidence which described the quantity and effect of dust in substantial detail. The *plaintiff did not seek an abatement of a temporary nuisance*, but sought damages only. See Tenn. Code Ann. § 29-3-114, Abatement of Nuisance.

of the grading permit. Metro admitted that Mr. Scalf has removed and sold topsoil from the property located at 3603 West Hamilton Road and that this activity, at least in part, occurred on the portion of the property zoned RS15, as reflected by the mandatory injunction, issued February 18, 1999 by the General Sessions Court for Davidson County.

The Metro Government cross-claimed against Mr. Scalf, alleging that it issued to him a grading permit which authorized the filling (raising the elevation) of road frontage in contemplation of the development of 2.7 acres commercially zoned, and that Mr. Scalf is removing topsoil from the residential acreage in connection with his business activity. Metro further alleged that "if Mr. Scalf, by removing topsoil, is engaged in 'mineral extraction' in violation of permitted land uses he should be enjoined" from removing topsoil from the residential portion of his property.

For answer to the cross-claim Mr. Scalf admitted that he is developing the commercially zoned acreage, and denied that his removal of topsoil is the extraction of minerals. He affirmatively pleaded that Metro Government is estopped to assert the cross-complaint because it issued the grading permit.[2]

## The Evidence

On April 10, 1995, Mr. Scalf purchased 73 acres of property that was split-zoned: 70.19 acres are zoned RS-15 (residential); .71 acres are zoned CL (commercial); and 2.78 acres are zoned OR-20 (office designation). He purchased this property for development and intended to fill (raise the elevation of) the portions of property zoned CL and OR-20. A permit from the Department of Public Works is required to fill property, and Mr. Scalf applied for such a permit by submitting a grading plan.

On July 21, 1995, the Metro Government issued Mr. Scalf a permit, which allowed him to locate a temporary office trailer and a storage barn on his property. On August 16, 1995, Metro Government approved the Grading Plan and issued Mr. Scalf a grading permit.

He owned a business called V & T Topsoil. After acquiring the grading permit, he began to excavate and sell topsoil from the property. Some of the topsoil was processed on the property through a Royer 365 machine, which creates dust when conditions are dry. Trucks were also used in the operation of Mr. Scalf's business. V & T Topsoil bought, sold and rented topsoil and grossed $1,149,925.15 from 1996 to 2000. In connection with his topsoil business, Mr. Scalf erected two buildings and a large sign advertising topsoil for sale on the property.

---

[2] It is worth observing that the relief sought by Mrs. Adair was a declaratory judgment that the Metro Government had failed to enforce its zoning laws, an exercise in futility and productive of no relief to the plaintiff. Metro did not challenge the complaint, but by cross-complaint against Mr. Scalf alleged that "*if he [Mr. Scalf] by removing topsoil is engaged in mineral extraction in violation of permitted land use, he should be enjoined.*" This hesitantly tentative allegation was likewise unchallenged.

Ms. Adair resides on and owns property surrounded on three sides by Mr. Scalf's property. She testified that the operation of Mr. Scalf's topsoil business first became a nuisance in 1997 because of the dust and noise from trucks as early as 6 a.m. and the lights and noise from trucks at night as late as 10:30. Mr. Scalf's business was in operation six (6) days a week. Ms. Adair testified a huge amount of dust was created which becomes residue on the inside and outside of her home, and that she has not been able to use her patio for about three (3) years. Other neighbors confirmed this testimony.

On December 16, 1998, the Codes Department issued a citation to Mr. Scalf for engaging in commercial activity in a residentially zoned district. The Environmental Court issued a mandatory injunction to prohibit Mr. Scalf from selling topsoil. On February 23, 1999, Public Works put Mr. Scalf on notice that he had not complied with the requirements of the grading plan and that a new plan was required.

On February 15, 1999, the Codes Department issued another citation to Mr. Scalf for engaging in mineral extraction on the property. The citation was issued because of the imbalance between the amount of material that had been excavated and exported from the property and the amount of fill that had been imported to the property. The imbalance led the Codes department to believe that Mr. Scalf was using the grading plan to circumvent the zoning code.

On February 12, 1999, the Codes Department duly posted a stop work order. On March 22, 1999, the Codes Department issued another citation to Mr. Scalf for allegedly violating this order.

On April 21, 1999, the three citations were heard by the Environmental Court. The Court ordered that Mr. Scalf cease excavating and exporting topsoil from the subject property until he demonstrated balance between cut and fill and fined him for violating the stop work order.

On May 26, 1999, and Order to Show Cause was entered by the Environmental Court ordering Mr. Scalf to show cause why he should not be held in contempt for violating the Environmental Court's order by cutting and removing topsoil from the property prior to demonstrating balance.

On May 28, 1999, Mr. Scalf's engineer informed the Codes Department that the property was in balance pursuant to Metro Government's regulations. As a result of this letter the Codes Department issued a letter on June 1, 1999, allowing Mr. Scalf to resume his cut and fill operation. However, later the Codes Department met with Public Works and was informed that Mr. Scalf had not complied with the Public Works requirements. Therefore, on June 2, 1999, the Codes Department posted another stop work order. In response, Mr. Scalf submitted a second grading plan on July 6, 1999 (1999 grading plan).[3]

---

[3] Based on the 1999 grading plan, Public Works issued Mr. Scalf a permit. Public Works, a week before the trial in Chancery Court, realized that the plan called for insufficient cut above the 2-year flood elevation to compensate

(continued...)

On December 22, 1999, the Codes Department issued a warrant for Mr. Scalf for engaging in commercial activity on the residential zoned acreage of the property. On February 18, 2000, prior to the hearing on this matter, the parties entered into an Agreed Order. The Agreed Order provided that Metro Government would withdraw prosecution if Mr. Scalf complied with certain requirements. He did so, and the litigation in the Environmental Court was terminated. The Chancery Court litigation soon followed when Ms. Adair filed the instant lawsuit on February 8, 2000..

## The Judgment

On February 22, 2001, the trial court held:

> Mr. Scalf is enjoined from the removal and processing of topsoil from acreage zoned RS15. The removal and processing of topsoil since December 16, 1998 is both a private and a public nuisance. Mr. Scalf . . . is also enjoined from the sale of topsoil from the RS15 acreage. The operation of selling and the sales themselves are a part of the nuisance conduct and are enjoined. The effect of the nuisance has been to deprive the plaintiff of her rights to the use and enjoyment of her residential real property adjoining the acreage owned by [Mr. Scalf]. The nuisance caused substantial and unreasonable discomfort, annoyance and inconvenience for which the plaintiff must be compensated by the defendant Mr. Scalf at the rate of $50.00 per day from December 16, 1998 . . . to the date of trial.

The complaint against Metro Government was dismissed because "it failed to establish a tort or other theory of recovery."

As to Metro Government's cross-claim for declaratory relief, the trial court held that Mr. Scalf's "topsoil removal, processing and sale cannot . . . be justified by development of the commercial section. This is a mineral extraction . . . [i]t is also commercial activity not permitted by . . .zoning designations." Therefore, "without an intent or plan to develop, the grading permit from Metro Public Works was not justified and is not an effective barrier to declaratory or injunctive relief."

As to Mr. Scalf's cross-claim against Metro Government for specific performance of the Agreed Order, the trial court held that Mr. Scalf was "not entitled to an order which would require [Metro] to take specific action . . .such as allow [Mr. Scalf] to operate a commercial enterprise on RS15 acreage." Further, "the order does not require specific action on [Metro's] part and [Mr. Scalf's] cross-claim for specific performance is denied.

---

[3](...continued)
for the total fill proposed by the plan.

## The Issues

As restated, the issues are (1) whether the trial court erred in finding that the defendant Mr. Scalf created and maintained a nuisance to the detriment and damage to the plaintiff; (2) whether the court erred in finding that Mr. Scalf should be enjoined from the removal and processing of topsoil from the residential zone; (3) whether the Metro Government was estopped to assert a legal position contrary to its legal position embodied in an Agreed Order in the Environmental Court; (4) whether the trial court erred in refusing to award Mr. Scalf damages for the alleged breach of contract by Metro Government.

Review is *de novo* on the record with a presumption that the judgment is correct unless the evidence preponderates against it, Rule 13(d) Tenn. R. App. P., *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn. 1993). The presumption does not apply to questions of law. *Campbell v. Florida Steel Corp*, 919 S.W.2d 26 (Tenn. 1996).

## Discussion

## I. Damages

The defendant Mr. Scalf does not seriously argue that the evidence fails to establish that his topsoil removal activities created a temporary nuisance to the plaintiff's habitation, lifestyle, and enjoyment of her residence. There was proof in abundance that the dust[4] was pervasive, settling all over the plaintiff's house, and sometimes into her house, and that certain equipment used in Mr. Scalf's business was operated as late as 10:30 p.m. to her considerable discomfort.

Because a temporary nuisance can be corrected by the expenditure of labor or money, *Pate v. City of Martin*, 614 S.W.2d 46 (Tenn. 1981), we agree with the trial court that the evidence proved only a temporary nuisance, and not a permanent one as argued by Mr. Scalf. The issue of the statute of limitations pleaded by Mr. Scalf is therefore moot. *See*, Tenn. Code Ann. § 28-3-105; *Chrisman v. Hill Home Development Inc.*, 978 S.W.2d 535 (Tenn. 1998).

In this jurisdiction the owner of real property is held to be qualified by reason of ownership alone to give an opinion of the value of her/his property. Because of her/his interest in the property it is presumed that (s)he knows its value and hence is qualified to testify accordingly. 1 *Wigmore on Evidence* § 716; Rule 701(8) Tennessee Rules of Evidence; *Airline Construction Inc. v. Barr*, 807 S.W.2d 247 (Tenn. App. 1990). However, as this Court stated in *Barr*:

> Although an "owner" of real property is deemed to have special knowledge about his property to offer an opinion as to its value, the owner's opinion will be given little weight when founded upon pure speculation. There must be some evidence, apart

---

[4] Referred to as "fugitive dust" by the experts, meaning dust generated by a refining machine which allowed a quantity of it to escape into the atmosphere.

from mere ownership, that this "value" is a product of reasoned analysis. This reasoning is consistent with the United States Claims Court as set forth in *Snow Bank Enterprises, Inc. v. United States*, in which it stated an owner's opinion as to the value of his property "must be founded upon evidence in the record, rather than upon conjecture, speculation or unwarranted assumptions." 65 Cl. Ct. 476 (1984), citing *United States v. Sowards,* 370 F.2d 87, 92 (10th Cir. 1966).

The plaintiff testified that the rental value of her "house as it stands today" was four hundred fifty dollars per month. When asked what "you think you could have rented it for before all this mess" she replied, "I could easily have rented it if I wanted to move out for a thousand dollars a month." This was all of the evidence concerning the rental value of the plaintiff's property.

The accepted method of proving damages resulting from a temporary nuisance is to present evidence of the diminution in the rental value of the affected property during the duration of the nuisance. **Hendrix v. City of Maryville**, 431 S.W.2d 292, (Tenn. Ct. App. 1968); **Pate v. City of Martin**, 614 S.W.2d 46 (Tenn. 1981).

The defendant Scalf argues that, under **Barr**, the opinion of the plaintiff is founded upon pure speculation and thus is of no probative value and cannot be considered. If this argument prevails, the award of damages is unsupported by evidence and hence must be vacated.

As we stated, it is not seriously disputed that the defendant Scalf created and maintained a temporary nuisance on his property to the discomfort and displeasure of the plaintiff. Mr. Scalf argues that the award of $50.00 per day as damages to the plaintiff is purely arbitrary and wholly unsupported by evidence. This argument is, prima facie, meritorious for various reasons, not the least of which is the fact that there were days during which the nuisance was abated but damages were nevertheless awarded. We note that the trial court held that "the plaintiff did not prove that the rental or sale value of her property had been depreciated by the operation of the commercial establishment next door . . . it is fair to say that her property appreciated gradually over the years . . . the plaintiff's damages are distinct from depreciation [of her residence]." According to the tax appraisals the market value of the plaintiff's property increased annually, which presumably is the basis for the finding of value appreciation. In all candor we are not concerned with this theory because the evidence proved the existence of a temporary, as contrasted to a permanent, nuisance. Loss of market value is relevant only as to the existence of a permanent nuisance.

Neither do we agree that the plaintiff failed to prove that the rental value of her residence was decreased by the temporary nuisance. She testified that the rental value of her residence had decreased $550.00 per month on account of Mr. Scalf's activities; she was not cross-examined in any significant way about her knowledge of rental values, and Mr. Scalf presented no evidence in refutation of her opinion. Since the trial court made no finding of lack of credibility, we think that the testimony of the plaintiff is supportive of an award of damages based upon diminution of rental value. We agree with the trial court that damages for the creation and maintenance of a temporary nuisance may be awarded for "injuries to the value of [the plaintiff's] own use and enjoyment," *City*

*of Murfreesboro v. Haynes*, 82 S.W.2d 236 (Tenn. Ct. App. 1935), and that the court could properly consider the discomforts caused by dust and unusual noises as invasive of the plaintiff's right to the enjoyment of her property. *Hendrix v. City of Maryville*, 431 S.W.2d 292 (Tenn. Ct. App. 1968). The record reveals no evidence as to the amount of damages for such discomfort, but we are unaware of any rule that requires a plaintiff who is victimized by a temporary nuisance to quantify her damages resulting from discomforts and annoyances. *See, Hendrix, supra.*

The Chancellor found that the temporary nuisance began December 16, 1998. The plaintiff argues that the proof established that Mr. Scalf's activities began the preceding year thus entitling her to a greater award. We cannot agree, because the area in proximity to her residence was then fraught with public and private construction projects which caused or contributed to her uncomfortable plight.

We find that the evidence preponderates against an award of $39,950.00, as damages, and in favor of an award of $14,300.00 (26 months x $550 per month). The record reveals no basis upon which to award pre-judgment interest. *See, Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (1998). The judgment is modified accordingly.

## II. The Injunction

Mr. Scalf was enjoined from the removal, processing and sale of topsoil from residential acreage, because such removal "is both a private and public nuisance." The injunction was also granted on grounds other than equitable relief: that the removal, processing, and sale of topsoil was "mineral extraction" within the meaning of the defining ordinance[5] which prohibits the extraction of minerals in the residentially zoned area. The trial court found that Mr. Scalf was primarily engaged in extracting and selling topsoil as a business venture as contrasted to the use of the topsoil in developing the commercially zoned portions of his property. Mr. Scalf argues that the definition of "mineral extraction" is vague and over broad, because grass clippings might conceivably be classified as non-metallic material. We do not find it necessary to decide the issue of whether topsoil is a mineral within the meaning of the ordinance; Mr. Scalf was already engaged in an unlawful business venture in a residential area,[6] which was adequate reason for the issuance of the injunction. This is not to say that topsoil may not be removed in a residential zone; common sense must intervene, and Mr. Scalf cannot be prevented from removing topsoil in furtherance of the development of his property, but he cannot do so primarily as a business venture. We cannot agree that the simple removal of topsoil is, prima facie, a public and private nuisance; rather, it is the

---

[5] The Ordinance defines mineral extraction as meaning "the extraction of metallic and nonmetallic minerals or materials including rock crushing, screening, and the necessary storage of explosives." Section § 17-40-060, Metro Code of Laws. Mr. Scalf is skeptical of this definition. Tenn. Code Ann. § 67-7-201(a) affords some guidance in authorizing a county to levy a mineral tax on "sand, gravel, sandstone, chert, and limestone." A "non-metallic material," as Mr. Scalf argues, could be grass clippings. But, chemically speaking, even water is a mineral.

[6] He sold in excess of a million dollars worth of topsoil before the injunction was issued.

*manner* of the removal that caused or created the nuisance of dust and noise so inimical to the plaintiff's well-being.

The trial court found that Mr. Scalf's grading plan was essentially a subterfuge to circumvent the zoning laws which prevented him from conducting his topsoil business.[7] The evidence does not preponderate against this finding.

### III. Estoppel

The appellant argues that the Metro Government is estopped to take a legal position in this litigation contrary to its legal position in the Environmental Court.

The parties agree that the affected departments of Metro Government often rendered differing instructions to Mr. Scalf, which resulted in some confusion and frustration.

He was cited to the Environmental Court by the Codes Department for conducting a commercial activity in a residential area. An Agreed Order was entered which provided, inter alia, that Mr. Scalf "shall cease all operation of topsoil business until the following has occurred:"

> a) Defendant shall lock the gate to the West Hamilton Road driveway entrance to the property and cease to use said entrance for any commercial use and any other unlawful land use. The gate may be unlocked to permit access for Metropolitan Government Department of Water and Sewer project.
>
> b) Defendant shall complete installation of driveway from his property onto Clarksville Highway, including the submission for approval of a plan for installing a traffic signal, installation of a traffic signal, and the acceptance thereof by the Metropolitan Government. Approval and acceptance by the Metropolitan Government shall not be unreasonably withheld.
>
> c) Defendant shall submit a new development plan.
>
> d) Defendant shall provide the information requested in the latter (sic) of August 27, 1999, a copy of which is attached hereto and incorporated by reference herein.

---

[7] According to the grading plan, Mr. Scalf intended to excavate 100,000 cubic yards of material in excess of that necessary for the required fill.

3.    The parties agree that the Defendant shall not be allowed credit for compensating cut on the property at issue for any fill above that which is required to bring said property to the level of the 100-year flood plain.

The new development plan was submitted and approved. The information requested was provided. The traffic signal was installed at Mr. Scalf's expense. In summary, Mr. Scalf complied with the Agreed Order, but he argues that the Metro Government, which proposed and prepared the Order, did not comply with it, but merely re-litigated the issue in the Chancery Court. Metro Government agrees that the Agreed Order is to be construed as a contractual agreement, *Hale v. Hale*, 838 S.W.2d 206 (Tenn. Ct. App. 1992), and that it nowhere makes reference to "mineral extraction" which the Chancery Court found was the activity engaged in by Mr. Scalf. It is initially difficult to lend credence to this argument because the Agreed Order was occasioned by Mr. Scalf's topsoil business, and at that time the parties made no distinction between "removal of topsoil" and "mineral extraction." In apparent recognition of the anomaly, Metro Government emphasizes the testimony of the various Department Heads and experts that it was never intended to allow mineral extraction because such action was unlawful and in derogation of law, that is, the Metro Government was without authority to enter into a contract which allowed the extraction of minerals in a residential area. Mr. Scalf contends that the Agreed Order in the Environmental Court is *res judicata* of the issue, and that the Chancery Court thus had no jurisdiction to adjudicate contrarily to the Agreed Order. We cannot agree. A *res judicata* defense requires proof, inter alia, that the same cause of action is involved in both actions, which is not the case here. *Lee v. Hall*, 790 S.W.2d 293 (Tenn. Ct. App. 1990). Neither do we agree that Metro Government is estopped to assert that the removal of topsoil constitutes mineral extraction. The doctrine of estoppel is ordinarily inapplicable to the government, and is imposed upon a government agency only under exceptional circumstances. *Elizabethton Housing and Dev. Agency v. Price*, 844 S.W. 614 (Tenn. Ct. App. 1992); *Carpenter v. State*, 838 S.W.2d 525 (Tenn. 1992); *Bledsoe County v. McReynolds*, 703 S.W.123 (Tenn. 1985). There are no exceptional circumstances in the case at Bar.

We note again that the plaintiff sought no justiciable relief against the Metro Government, which filed an answer denying that it had failed to enforce its Ordinances and cross-claimed against Mr. Scalf, as aforesaid. The evidence does not preponderate against the finding that Mr. Scalf failed to prove the liability of Metro Government for damages for breach of contract.

Finally, we consider the argument of Mr. Scalf that the injunction is overly broad and harsh in its application because it effectively prohibits the development of his property. He was enjoined "from removal, processing and sale of topsoil from his acreage zoned RS13." As pointed out, Mr. Scalf cannot satisfy storm water management regulations if he cannot remove topsoil.

The judgment is modified as follows:

(1)    The removal, processing, and sale of topsoil, per se, does not constitute a nuisance. The manner and method of the removal and processing of the topsoil, under the evidence presented, is a nuisance to the plaintiff and will be abated, the same being temporary in

nature. Damages in the award of $14,400.00 are awarded to Ms. Adair. Mr. Scalf will comply with Pollution Control regulations which pertain to the development of his property.

(2) Since Mr. Scalf was engaged in the commercial sale of topsoil in an area zoned for residential use, he is enjoined from processing and selling topsoil in violation of the Code of Laws of the Metro Government. Mr. Scalf will comply with the Department of Codes interpretation of what constitutes a prohibited commercial sale. He is not enjoined from developing his property consistent with the Code of Laws of the Metro Government, so long as his activities do not create a nuisance as herein articulated. The approximate amount of fill necessary to develop the property zoned for commercial use and the corresponding amount of topsoil necessary to be excavated for this purpose will be determined by the Metro Government.

The judgment, as modified, is affirmed with costs assessed equally to Ms. Adair and Mr. Scalf.


PER CURIUM